**GSGSB, INC., a Pennsylvania corporation, Plaintiff,**

v.

**NEW YORK YANKEES, an Ohio limited partnership, Defendant.**

No. 91 Civ. 1803 (SWK).

United States District Court, S.D. New York.

Sept. 28, 1994.

Ferrara & Hantman, New York City by Robert J. Hantman, Raffi Momjian, for plaintiff.

Dorsey & Whitney, New York City by James M. Bergen, for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

This is an action brought by the architectural firm of Gilboy, Stauffer, Giombetti, Skibinski and Bellante ("GSGSB")[1] against the twenty-two time World Series Champions, the New York Yankees Partnership (the "Yankees") for breach of a purported oral agreement. GSGSB now moves for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the grounds that there is no genuine issue of material fact as to Count II (quantum meruit) and Count IV (damages on account stated) of the complaint. The Yankees oppose the motion and cross-move for (1) summary judgment on Count I (breach of contract) and Count IV; (2) partial summary judgment as to Count II; and (3) to dismiss Count III (fraud), pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. For the reasons set forth below, GSGSB's motions are denied. The Yankees' cross-motion for summary judgment is granted in part and denied in part. Specifically, the Yankees' motion with respect to Count I and Count IV is granted, and the Yankees' cross-motion for partial summary judgment with respect to Count II is denied. The Yankees' motion with respect to Count III is granted.

## BACKGROUND[2]

The instant action arises, not from what occurred on the playing field, but rather, from what occurred in—and in regard to— Yankee Stadium. On August 7, 1984, Eu-

gene McHale ("McHale"), then president of the Yankees, and John P. Gilboy, Jr. ("Gilboy"), a partner at GSGSB, met to discuss proposed improvements to Yankee Stadium (the "August 7th meeting"). The improvements were to include: (1) construction of thirty-six luxury suites ("superboxes") along the first and third base lines; (2) the creation of a glass-enclosed restaurant containing the Yankee Club; and (3) the expansion of the "Great Moments" banquet room (collectively, the "Project").

According to GSGSB, although no contract was ever signed, the Yankees directed GSGSB to prepare and deliver drawings and specifications on an expedited basis, as the Yankees hoped to complete the renovations by the 1985 season. Thereafter, purportedly in accordance with the Yankees' instructions but without a contract, GSGSB performed architectural and engineering services related to the Project, including preparation of construction drawings, design studies and document inventory. At the present time, however, no improvements have in fact been made to Yankee Stadium, nor has GSGSB received any remuneration for the work done in connection with the Project.

The Yankees dispute that GSGSB was ever hired to work on the Project, and instead contend that GSGSB performed its services on a "risk" or "contingent" basis, subject to a final written agreement between the parties. Specifically, the Yankees maintain that they told GSGSB both at the August 7th meeting and thereafter that the City of New York (the "City") owned Yankee Stadium and that, as outlined in the lease agreement between the City and the Yankees, City approval was necessary before any improvements or construction could commence. In addition, the Yankees claim that they told GSGSB that

---

1. GSGSB brings this suit as predecessor in interest to the partnership of Gilboy, Stauffer, Skibinski and Bellante ("GSSB"). In February 1991, GSSB assigned all of its claims, causes of action, suits and other interests and rights of partnership to GSGSB.

2. Unless otherwise noted, the following statement of relevant facts is derived from Plaintiff's Statement Pursuant to Local Civil Rule 3(g); Statement Pursuant to Civil Rule 3(g) in Support

of Defendant's Cross–Motion for Summary Judgment; Defendant's Rule 3(g) Statement in Response to Plaintiff's Statement Pursuant to Local Civil Rule 3(g); Plaintiff's Rule 3(g) Statement in Response to Defendant's Statement Pursuant to Local Civil Rule 3(g); the Declaration of John Patrick Gilboy, Jr., dated June 28, 1993 (the "Gilboy Dec."); and the Affidavit of Eugene McHale, sworn to on May 28, 1993 (the "McHale Aff.").

appropriate financing would have to be arranged with the City, and that GSGSB could not be paid for any work until such financing was approved. As the City's permission was necessary to make Stadium improvements, the Yankees maintain that they never intended, nor even had the authority to enter into a contract unless and until financing and approval were obtained from the City. In fact, although the Yankees engaged in protracted negotiations with the City over the course of numerous meetings, they were unable to obtain the necessary consent.

On March 15, 1991, GSGSB commenced the instant action, alleging causes of action for breach of contract (Count I), quantum meruit (Count II), fraud (Count III) and damages on account stated (Count IV). GSGSB now moves for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, as to Counts II and IV of the complaint. Specifically, GSGSB contends that there is no genuine issue of material fact regarding its entitlement to fees incurred in connection with the Project. According to GSGSB, the fee arrangement, while indisputably oral, is reflected in correspondence, draft contracts, representations made by the Yankees to both GSGSB and third parties, invoices documenting plaintiff's fees and expenses and amounts credited against the GSGSB account.

The Yankees oppose GSGSB's motion and cross-move for summary judgment, also pursuant to Rule 56, on the grounds that, as the City never approved financing of the Project, there is no issue of fact regarding the lack of an enforceable agreement between the parties. The Yankees claim further that plaintiff's own documents, the testimony of a former GSGSB principal and the correspondence between the parties demonstrate that summary judgment must be granted in its favor.

## I. Correspondence Between the Parties

While both parties concede that no contract was ever executed, GSGSB contends that the terms of its employment were memorialized in several documents written by McHale, the Yankees' president. Specifically, GSGSB relies upon a memorandum dated September 26, 1984, wherein McHale advised Yankees general partner George Steinbrenner, III ("Steinbrenner") as to the "possible addition" of the superboxes and recommended that, "[i]f we go forward with the project and assuming Gilboy's budget is in line ... we use Gilboy's firm to do the work." *See* memorandum from McHale to Steinbrenner of 9/26/84, annexed to the McHale Aff. as Exh. "C." Similarly, in a letter dated February 20, 1985 (the "February 20th letter"), McHale advised Henry J. Stern, the Commissioner of the New York City Department of Parks, that "[t]he architectural firm of GSGSB was hired to do the design work on the addition of luxury suites at Yankee Stadium." *See* letter from McHale to Stern of 2/20/85, annexed to the Declaration of John Peter Barie, dated April 10, 1993 (the "Barie Dec."), as Exh. "28."

Although the Yankees admit that McHale authored the two documents, they dispute their relevance as proof that an agreement was reached between the parties. For example, the Yankees argue that the February 20th letter was unrelated to the Project and actually pertained to potential stadium renovations, uncovered during the course of GSGSB's work, that might be necessary to ensure public safety. The Yankees maintain that no safety measures were ultimately necessary or undertaken, and that the initial design calculation by GSGSB suggesting the need for such action was in fact wrong.

The Yankees argue further that GSGSB's own correspondence indicates that it understood from the outset that the Project was contingent upon approval and financing by the City. Specifically, the Yankees point to an August 8, 1984 letter from GSGSB partner Gilboy to McHale which states in part that "[GSGSB is] very excited about the luxury box project. *If arrangements with the City can be completed to permit the Yankees to construct and finance the program,* I believe we can use the boxes in the Spring of 1985." *See* letter from Gilboy to McHale of 8/8/94, annexed to the McHale Aff. as Exh. "A" (emphasis added).

## II. The Unsigned Draft Agreements

GSGSB also claims that a contract arose between the parties on or about November 8,

1985 as a result of negotiations and revisions to a draft agreement. Following a number of meetings between GSGSB and the Yankees, GSGSB prepared a "Standard Form of Agreement Between Owner and Architect," dated October 29, 1984 and marked "Draft" (the "October 29th Draft"). The October 29th Draft was between the "New York Yankees Partnership" and "Gilboy, Stauffer, Giombetti, Skibinski, Bellante" for a project described as "New York Yankee Stadium Improvements—New main level suite entrance—luxury suite design." *See* the October 29th Draft, annexed to the Barie Dec. as Exh. "6." Sometime after October 29, 1984, McHale informed Steinbrenner about the October 29th Draft, who then forwarded it to the Yankees' counsel, James Frankel ("Frankel") of Shea & Gould.[3] Frankel and McHale then negotiated the terms of the October 29th Draft and, on July 30 and August 7, 1985, Shea & Gould forwarded various new drafts to the Yankees (the "July 30th Draft" and the "August 7th Draft," respectively).[4]

Thereafter, by letter dated September 20, 1985, Ken Lazaruk, also of Shea & Gould, sent a revised draft to McHale and Dominic Provini ("Provini"), head of operations of GSGSB (the "September 20th Draft").[5] On or about November 8, 1985, Lazaruk sent McHale another draft of the revised agreement (the "November 8th Draft").[6] The transmittal letter of this final draft stated, in pertinent part, "[e]nclosed is a revised *draft* agreement between owner and architect for this project." *See* letter from Lazaruk to McHale of 11/8/92, annexed to the Barie Dec. as Exh. "22."

Thus, in total, no less than five draft contracts were discussed by the parties between October 1984 and November 1985. GSGSB alleges, however, that none of these drafts indicated that GSGSB was working at "risk" or on a "contingency" basis. Rather, according to GSGSB, Frankel indicated that he understood the proposed fee arrangement between GSGSB and the Yankees, and that this fee arrangement was reflected in the various contract drafts. No contract was ever executed, however, and in fact, McHale claims that he never indicated that any draft of the contract was acceptable or that a contract could be executed without Steinbrenner's final approval.

### III. The Fee Arrangement and Invoices

GSGSB also contends that the Yankees orally agreed to pay its invoices and settled on a certain fee in connection with the services rendered. The Yankees characterize

3. Frankel was retained by the Yankees to represent it in connection with the negotiation of a written contract with GSGSB. In or about May 1985, GSGSB also retained Frankel to represent it with respect to a variety of legal matters, including the negotiation of the various draft agreements. The Yankees maintain that they did not consent to this "joint" representation.

4. The July 30th Draft indicates, *inter alia*, that: (1) the agreement is dated "July __, 1985"; (2) the construction cost is $3.5 million; (3) the architect's basic compensation rate is 7% of the construction cost; and (4) payments are to be made by phase based on completion percentage. *See* July 30th Draft, annexed to the Barie Dec. as Exh. "14." The August 7th Draft reflects, *inter alia*, that: (1) the date is now "August __, 1985;" (2) the compensation paragraph has an "X" through it; (3) payments by phase has a box drawn around it, and the word "open" handwritten above the box; (4) section 10A (termination expenses) as well as page 9A (architect's compensation) is marked "review" and (5) "scope to be supplied in final draft of agreement" is handwritten on page one. *See* August 7th Draft, annexed to the Barie Dec. as Exhs. "15" and "16."

5. In the September 20th Draft: (1) both the month and day of the agreement are now blank; (2) the cost of construction is estimated at $4,115,000; (3) basic compensation is set at 7% of the cost of construction; (4) schedule 1— "scope of work"—is incorporated into the agreement for the first time; (5) the compensation provision provides that basic compensation will be paid to the architects "to the extent it has not already been paid within thirty (30) days of execution of this Agreement;" (6) section 10A (termination expenses) and page 9A are circled with the notation "need something" written next to the former; and (7) the handwritten instruction "have our attor[ney] and insur. look at" appears on page 11 (other conditions or services). *See* September 20th Draft, annexed to the Barie Dec. at Exh. "21."

6. In the November 8th Draft: (1) the date is blank; (2) the cost of construction remains at $4,511,000; (3) the 7% of cost for basic compensation remains the same; and (4) phase I of completion values are set. *See* November 8th Draft, annexed to the Barie Dec. as Exh. "22."

the invoices as self-serving and argue that neither the invoices, the correspondence nor any conversations between the parties can be construed to suggest that the Yankees did in fact agree to pay GSGSB prior to gaining approval from the City. The Yankees argue further that they orally objected to the letters and invoices, and that Provini informed them that the invoices were merely for GSGSB's internal purposes in monitoring time spent on the Project. In fact, according to GSGSB's Provini, GSGSB sent out the invoices in hopes of extricating itself from the predicament of not having a contractual agreement with the Yankees.

## A. The September 3, 1985 Letter

GSGSB first points to a September 3, 1985 letter (the "September 3rd letter") from Provini to McHale, memorializing an August 29, 1985 meeting in which Provini indicated that the parties had "settled on a fee of $610,000 for engineering on the Third and First Base sides." *See* letter from Provini to McHale of 9/3/85, annexed to the McHale Aff. as Exh. "E." The letter indicated further that additional reimbursables, such as for "reproduction" and "Federal Express," were to be billed as the Project proceeded into construction. *Id.* In that same letter, Provini notified McHale that he shortly would be receiving an invoice for $550,796.00. *Id.* According to GSGSB, the September 3rd letter is evidence that the parties had agreed on a fee for GSGSB's work.

McHale contends that the September 3rd letter does not accurately reflect the understanding between the Yankees and GSGSB as it appears to assume that (1) the parties had agreed on the fee; and (2) the Yankees had agreed to accept the $550,796.00 invoice. McHale contends further that he informed Provini that he did not agree either to the terms of the September 3rd letter, or to the invoices referenced therein, and that all discussions regarding fees were tentative pending authorization by Steinbrenner.

McHale also contends that Provini, the author of the September 3rd letter, conceded that the letter contained certain errors. In fact, Provini testified at his deposition that, if McHale had agreed to the fee of $610,000,

Provini would have "st[u]ck a contract in front of him and ha[d] him sign it." *See* deposition of Dominic Provini, taken on 3/27/92 ("Provini Dep."), annexed to the Bergen Aff. as Exh. "D," at 67.

## B. Additional Correspondence and Invoices

GSGSB alleges further that an oral agreement was memorialized in various invoices sent to the Yankees. Specifically, by letter dated September 11, 1985, Provini sent McHale GSGSB's Invoice No. 9505 in the amount of $550,796.00 and Invoice No. 9522 in the amount of $6,918.13 for reimbursables. *See* letter from Provini to McHale of 9/11/85, annexed to the Affidavit of Robert J. Hantman, sworn to on April 12, 1993 (the "Hantman Aff.") as Exh. "A," at 13. Subsequently, in a letter dated December 24, 1985, GSGSB forwarded Invoice No. 9833 to the Yankees for reimbursable expenses. *See* letter from Provini to McHale of 12/24/85, annexed to the Hantman Aff. as Exh. "B," at 3–44. The Yankees did not respond to any of these GSGSB invoices.

Provini also sent a letter, dated September 13, 1985, to Ken Lazaruk at Shea & Gould indicating that the Yankees had agreed to pay GSGSB a total of $610,000.00 and that "this should conclude the final items of the contract." *See* letter from Provini to McHale of 9/13/85, annexed to the Barie Dec. as Exh. "20." Enclosed with the letter to Lazaruk was a copy of the September 3rd letter explaining how the parties had arrived at the fee. Both Provini and McHale now indicate, however, that the letter did not mean that the Yankees had "agreed" to anything, and that GSGSB understood that services rendered were performed subject to Steinbrenner's and the City's approval.

On February 19, 1986, Provini sent McHale a letter which reiterated GSGSB's fee for services rendered. *See* letter from Provini to McHale of 2/19/86, annexed to the McHale Aff. as Exh. "F." The letter indicated that a total amount of $613,796.00 was due and that, pursuant to McHale's agreement with Gilboy, the interest would "roll" into the fee when financing became available, "but no later than September 1986." *Id.* Although

McHale contends that he notified Provini that the Yankees had never agreed to the fees, interest or invoices referenced in the February 19, 1986 letter, GSGSB maintains that the Yankees never objected, disputed or responded to any of the letters or invoices. Provini has since testified that the February 19, 1986 letter (1) was based on Gilboy's representation that the interest would be rolled into the final number *once approval was obtained;* (2) did not memorialize McHale's agreement to a 10% interest rate, which was provided by GSGSB's comptroller, George Campbell; and (3) was merely part of an attempt by GSGSB to make a record with respect to the amount GSGSB claims was due and owing. Provini Dep. at 75–78.

On or about April 25, 1986, John Symuleski ("Symuleski"), comptroller for GSGSB, sent McHale an additional confirmation letter indicating that the amount due GSGSB as of March 31, 1986 totaled $563,125.01.[7] *See* letter from Symuleski to McHale of 4/25/86, annexed to the Barie Dec. as Exh. "25." The letter requested that, assuming the amount was in agreement with the Yankees' records, the Yankees should sign in the space provided below the text of the letter and return it to GSGSB's auditors. The Yankees did not respond.

Thereafter, at a May 12, 1986 meeting between GSGSB's Provini, William Dowling, in-house counsel for the Yankees, David Weidler, comptroller for the Yankees, and McHale, Provini apparently indicated that:

[GSGSB's] compensation will require adjustment based on the escalated cost of construction. GSGSB questioned the Yankees' acknowledgement of the A/E letter dated February 19, 1986. The letter as written notes the increase in fee because of interest and states a September 1986 date for reconciliation. Gene McHale said he would review the 2 points with George and have a response this week. Anyone taking exception to the statements in these minutes or having any knowledge of omission shall notify the architect in writing within three (3) days after receipt of the minutes, listing in detail the exceptions, otherwise, the minutes shall stand as written.

Minutes of meeting, dated 5/12/86, annexed to the Barie Dec. as Exh. "26." Although McHale, Dowling and Weidler were sent copies of the minutes, the Yankees never took exception to them. The Yankees now contend, however, that the minutes (1) are completely self-serving as they were prepared by GSGSB; and (2) confirm further that Steinbrenner's approval was necessary, as McHale "said he would review the two points with George [Steinbrenner] and have a response this week." *Id.*

Subsequently, in a letter dated June 23, 1986, Robert T. Kelly and Company, accountants for GSGSB, sent David Weidler, chief financial officer of the Yankees, who was the comptroller and treasurer of the Yankees during the Project, a copy of GSGSB's request for confirmation of the balance due. Weidler did not respond to the June 23, 1986 letter. GSGSB contends that Steinbrenner, however, acknowledged discussing GSGSB's invoices with Weidler. *See* deposition of George Steinbrenner, taken on 3/11/92, annexed to the Hantman Aff. as Exh. "K," at 12.

Thereafter, by letter dated July 10, 1986, George Campbell, chief financial officer of GSGSB, wrote Weidler, stating:

This letter is in regard to two issues pertaining to reference project. If you haven't received Robert T. Kelly & Company's accounts receivable confirmation letter initially sent to Mr. Eugene McHale on April 25th, I am sure that you have received the follow up addressed to you dated June 23rd. Your timely response to Robert T. Kelly would be appreciated.

Enclosed is a copy of a letter sent to Gene McHale on 2/19/86. Since September is less than two months away, I wanted you to particularly be aware of your agreement for payment of our fee as set forth in paragraph four of subject letter.

*See* letter from Campbell to Weidler of 7/10/86, annexed to the Hantman Aff. as Exh.

---

7. This total appears to conflict with the total contained in the February 19, 1986 letter indicating that the amount due was $613,796.00.

"A," at 65. Weidler did not respond to the letter.

### C. The Yankees' Response

By letter dated August 15, 1986, William F. Dowling, the Yankees' then general counsel, wrote to GSGSB, stating in part:

[GSGSB] agreed to and did perform architectural and engineering services on a risk basis to the New York Yankees on the expectation that it would be retained to perform architectural services if the New York Yankees determined to construct certain luxury boxes. No such decision has yet been made.

*See* letter from Dowling to GSGSB of 8/15/86, annexed to the Hantman Aff. as Exh. "A," at 69. The August 15, 1986 letter advised GSGSB that (1) the Yankees were unable to verify or confirm the amount due, if any, to GSGSB; (2) the Yankees "had been told on several occasions that the statements of account [were sent] to us for GSGSB internal purposes and were not a record of a sum due and owing on account;" and (3) GSGSB "[a]greed to and did perform architectural and engineering services on a risk basis to the New York Yankees on the expectation that it would be retained to perform architectural services if the New York Yankees determined to construct certain luxury boxes." *Id.*

In a memo to his file, dated July 20, 1986, Steinbrenner, upon learning of the invoices forwarded by GSGSB, indicated:

To say the least I was shocked.... I immediately reached for Gilboy who then called me back.... When I questioned what the hell the arrival of a sudden invoice for $550,000 meant with an alleged agreement for 10% interest, [Gilboy] told me that Gene McHale had made the agreement with him. I told him that was bullshit. Gene McHale could not make such an agreement with him and that no one at the Yankees had ever made such an agreement with him.... I said I want to make it clear to you Jack, I have absolutely no agreement with you on fee, interest, or anything else. I had never made any agreement with you and that I did not

believe that Gene McHale had because he would have had to have my consent.

*See* letter to file from Steinbrenner of 7/20/86, annexed to the Barie Dec. as Exh. "27." Steinbrenner then wrote:

I told him that I had made it very clear to him at the outset that any work he did on this project would be on a "risk" basis ... [and] if we didn't proceed, he'd just be out any work he did.... I then got a hold of Gene McHale and he told me that at no time did he agree to any deal ... that was outright lies. He said interestingly, almost humorously, that Gilboy had told him that I agreed to it all. So here you have Gilboy telling me that Gene McHale agreed to it, and Gilboy telling Gene McHale that I agreed to it.

*Id.* Finally, Steinbrenner indicated:

We have no agreement. We never have had any agreement. If there was any deal of this magnitude ... you could be sure that all of our lawyers had looked it over in writing and that it was in proper contractual form.

*Id.*

### IV. Representations to Third Parties

GSGSB contends that a September 11, 1985 report prepared by Feld, Kaminetzky & Cohen, P.C., engineering consultants for the City of New York, Department of Parks and Recreation, also indicates that the Yankees had retained GSGSB as architects. Specifically, GSGSB relies upon the introduction to the draft report, which states that the Yankees "ha[ve] retained the firm of GSGSB to prepare designs and plans for the improvement of the existing framing at the Yankee Stadium." *See* the September 11, 1985 report, annexed to the Hantman Aff. as Exh. "A," at 17.

Although the Yankees concede that a draft report was prepared by the firm of Feld, Kaminetzky & Cohen, P.C., consulting engineers who were retained by the City to conduct the review of the Yankee stadium improvement design, it disputes whether any representations contained in the report regarding GSGSB are binding as to them.

## V. Invoice Credits

GSGSB also contends that the fact that the Yankees accepted payment for certain amounts owed by the Yankees in the form of credits on GSGSB's invoices indicates that the Yankees accepted the invoices as bills for services performed by GSGSB. Specifically, by letter dated October 2, 1986, John C. Fugazy, executive marketing advisor for the Yankees, sent GSGSB an invoice for $10,000 representing a bill for an August 8, 1986 "Corporate Host" night. *See* letter from Fugazy to Gilboy of 10/2/86, annexed to the Hantman Aff. as Exh. "A," at 71–72. By way of payment, the Yankees were given a credit of $10,000 on their outstanding invoice which is reflected in a November 4, 1986 GSGSB Invoice No. 10830.

In addition, by letter dated January 14, 1987 from Joel S. White ("White"), director of customer services at the Yankees, GSGSB was apprised of the $1,500 cost of membership in the Yankees Club. *See* letter from White to Gilboy of 1/14/87, annexed to the Hantman Aff. as Exh. "A," at 73–74. This fee was also paid by giving the Yankees a credit of $1,500 towards GSGSB Invoice No. 11065, dated January 8, 1987. By letter dated January 28, 1987, George Campbell of GSGSB wrote to White, stating:

> In reference to your January 14th letter to Mr. Jack Gilboy, enclosed is our completed Yankee Club Membership Form for our '87 Yankee Club Membership. Payment of the $1,500.00 has been satisfied by the deduction of the amount from the amount due GSGSB from the Yankees on our 1/8/87 Invoice # 11065.

*See* letter from Campbell to White of 1/28/87, annexed to the Hantman Aff. as Exh. "A," at 75–77. GSGSB Invoice No. 12015, dated August 12, 1987, also reflects these credits for Yankees' Kids Day ($10,000.00) and the 1987 Yankee Club Membership ($1,500.00). At no time did the Yankees either acknowledge or take exception to the $11,500 credits given by GSGSB as partial payment against their bill.

## VI. The Provini Deposition

In support of their contention that GSGSB was working on a "risk" basis, the Yankees point to the deposition testimony of GSGSB's former employee, Provini. In fact, Provini testified that Gilboy acknowledged in late 1984 that GSGSB was performing services "on the come" for the Yankees in the hopes of becoming architects for the possible improvements should the Yankees ever obtain financing and approval from the City. Specifically, Provini testified:

Q. Did he say that during that conversation that the work is on the come and, they we're going to get the job?

A. His [Gilboy's] response was not, "It's not to come. We're going to get the job." His response was "this is what it takes to get the job. We've got to expend some dollars to get that job." That kind of conversation.

Q. And do you know what he meant when he said, "This is what it takes to get the job?"

A. In my opinion, like many other times, you have to work on the come, as we call it in our business. And at some specific point you've got to make the decision whether or not to cut it or continue, and that's a pure business decision.

Provini Dep. at 10–11. Provini testified further that he never reached any agreement with McHale for a fee of $610,000, and that if he had, he would have had McHale sign a contract to that effect. Provini Dep. at 65–67. Provini then testified at length that he "understood" throughout his discussions with McHale that there was no contract with the Yankees and that GSGSB would not receive any compensation unless the requisite approvals and financing were obtained from the City and the Project actually proceeded to construction. Provini Dep. at 29–30, 36–39. Specifically, Provini testified:

Q. Do you recall what Mr. McHale said in connection [with the Project]?

A. Yes, we can't go into the construction phase, unless we have all appropriations in line. And the total project is hinging on those commitments.

Q. And was this something that you discussed with Mr. McHale on more than one occasion in late '84 and '85?

A. Yes, on a continuous occasion, because that was the most important part of the

job. And if monies weren't approved, nobody was going to get paid.

Provini Dep. at 38. According to Provini, GSGSB made a calculated business decision to continue performing work on a risk basis without any agreement with the Yankees in place. Provini Dep. at 42–44. Provini testified:

Q. In '85, in the last quarter of '84, did— in these conversations about the fact that there was no contract, did either Mr. Bellante or Mr. Gilboy indicate to you that they believed that the project was going to go forward and you really shouldn't worry about it?

A. Well, Mr. Bellante did not, but Mr. Gilboy did to a point where he basically told me stop pestering.... He said something like ... "Don't worry about it, it's not your concern if it's going to happen." Get off of my back sort of statement. I don't know the exact words.

\*    \*    \*    \*    \*    \*

Q. I can ask you, who would ever do a half a million dollars worth of work, unless you thought you were going to get paid?

A. Only one answer to that, GSGSB.

Provini Dep. at 16–21, 152.

GSGSB contends that Provini lied throughout his deposition, and in fact had been adamant about suing the Yankees in order to recover the contested funds. *See* Affidavit of Lawrence M. Ludwig ("Ludwig Aff."), sworn to on June 22, 1993, at ¶¶ 11–12; Declaration of E. Lawrence Bellante, sworn to on June 20, 1993, at ¶ 5. GSGSB argues further that Provini never indicated that any documents were ambiguous or that he was aware of any "hidden" agreement between the Yankees and GSGSB. *See* Ludwig Aff. at ¶¶ 15–16.

## DISCUSSION

### I. Standard of Law

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), and may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the nonmoving party's case on which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The nonmoving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed. R.Civ.P. 56(e), by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552.

■ The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1187 (2d Cir.1987); *Eastway Constr. Corp. v. New York,* 762 F.2d 243, 249 (2d Cir.1985); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. at 158–59, 90 S.Ct. at 1609. But the Court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), and grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative. *Id.* at 249–50, 106 S.Ct. at 2510–11; *see Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 12–15 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Argus Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ To determine whether the moving party has met his or her burden, the Court must focus on both the materiality and the genuineness of the factual issues raised by the nonmovant. As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. A dispute over irrelevant or unnecessary facts will not preclude summary judgment, *id.*, but the presence of unresolved factual issues that are material to the outcome of the litigation mandates a denial of summary judgment. *See, e.g., Knight v. United States Fire Ins. Co.*, 804 F.2d at 11–12.

■ Once the nonmoving party has successfully met the burden of establishing the existence of a genuine dispute as to an issue of material fact, summary judgment must be denied unless the moving party comes forward with additional evidence sufficient to establish his or her burden under Rule 56. *Celotex Corp. v. Catrett*, 477 U.S. at 330 & n. 2, 106 S.Ct. at 2556 & n. 2 (Brennan, J., dissenting). In sum, if the Court determines that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)).

GSGSB now moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment with respect to Counts II (quantum meruit) and IV (damages on account stated) of the complaint. The Yankees cross-move for partial summary judgment, pursuant to Rule 56(b), seeking dismissal of: (1) Count I, (breach of oral contract), on the basis that the claim is inadequate as a matter of law; and (2) Count IV, on the grounds that the parties never had an underlying agreement that the Yankees would pay a

certain fee for GSGSB's services, and the Yankees objected both orally and in writing to any alleged account. Further, the Yankees cross-move for the dismissal of Count III (fraud), pursuant to Rule 9(b), on the ground that GSGSB has failed to plead fraud with sufficient particularity. The Yankees also seek dismissal of portions of GSGSB's quantum meruit and breach of contract claims to the extent those claims are barred by the applicable statute of limitations. For the reasons set forth below, GSGSB's motion is denied. The Yankees' motion is granted in part and denied in part.

## II. Quantum Meruit [8]

### A. GSGSB's Motion for Summary Judgment

■ The elements of a claim for quantum meruit are (1) plaintiff rendered services to defendant; (2) defendant accepted those services; (3) plaintiff expected compensation; and (4) the reasonable value of the services. *Moors v. Hall*, 143 A.D.2d 336, 532 N.Y.S.2d 412, 414 (2d Dep't 1988); *see also Argo Marine Sys., Inc. v. Camar Corp.*, 755 F.2d 1006, 1011 (2d Cir.1985); *Paper Corp. of United States v. Schoeller Technical Papers, Inc.*, 773 F.Supp. 632, 640–41 (S.D.N.Y.1991). As a general rule, the performance and acceptance of services gives rise to an inference of an implied contract to pay for the reasonable value of such services. *Moors v. Hall*, 532 N.Y.S.2d at 414. This inference, however, does not arise where "because of the relationship of the parties, it is natural that such service should be rendered without expectation of pay." *Id.* (quoting *Robinson v. Munn*, 238 N.Y. 40, 43, 143 N.E. 784 (1924)). The question of whether a party had a reasonable expectation of receiving compensation is an issue of fact for the jury. *Moors v. Hall*, 532 N.Y.S.2d at 414; *see also Paper Corp. of United States v. Schoeller Technical Papers, Inc.*, 773 F.Supp. at 641 (existence of implied contract is a question of fact).

---

**8.** For purposes of this discussion, the Court assumes that no express contract exists between the parties. The law is well-settled, however, that "[a] contract cannot be implied in fact when there is an express contract covering the subject matter involved." *Julien J. Studley, Inc. v. New York News, Inc.*, 70 N.Y.2d 628, 512 N.E.2d 300, 301, 518 N.Y.S.2d 779, 780 (1987); *see also Chrysler Capital Corp. v. Century Power Corp.*, 778 F.Supp. 1260, 1272 (S.D.N.Y.1991). Thus, GSGSB cannot recover under both breach of contract and quantum meruit causes of action.

■ Assuming for purposes of this motion that GSGSB rendered architectural and engineering services to the Yankees and that the Yankees knew that such services were being rendered, the Court finds that an issue of fact exists as to whether GSGSB reasonably expected compensation for the work it performed. Although GSGSB submitted bills for services rendered, *see Moors v. Hall,* 532 N.Y.S.2d at 414 (noting that billing is one indication that compensation was expected), other evidence indicates that GSGSB did not expect to be compensated prior to executing a formal agreement and the Yankees' obtaining City approval and financing for the Project. Specifically, by letter dated August 8, 1984, Gilboy indicated that GSGSB could complete construction of the superboxes by spring 1985 "[i]f arrangements with the City can be completed to permit the Yankees to construct and finance the program." *See* letter from Gilboy to McHale of 8/8/94, annexed to the McHale Aff. as Exh. "A." More significantly, Provini testified that Gilboy decided to work "on the come" in anticipation of securing a contract and that he sent invoices, not in the expectation of payment, but rather, merely to track costs. Provini Dep. at 12, 21, 43–44, 150–52. Thus, the question of whether GSGSB expected to be compensated raises an issue of fact that can only be determined at trial.

## B. The Yankees' Motion for Summary Judgment

■ The Yankees assert that plaintiff's quantum meruit claim is barred in part by the six-year statute of limitations, New York Civil Procedure Law & Rules ("NYCPLR") § 213(2), which provides:

> [A]n action upon a contractual obligation or liability express or implied [must be commenced within six years].

NYCPLR § 213(2) (McKinney 1972). According to the Yankees, as the instant action was served on or about April 4, 1991, any portion of the cause of action accruing before April 4, 1985 is time-barred.

Contrary to the Yankees' argument, however, a cause of action for quantum meruit begins to run when the final service has been performed. *Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff,* 638 F.Supp. 714, 722 (S.D.N.Y.1986) (citing *In re Williams Estate,* 179 Misc. 805, 39 N.Y.S.2d 741 (Surr.Ct.1942)); *see also Martin v. Camp,* 219 N.Y. 170, 177, 114 N.E. 46 (1916); *County of Broome v. Board of Educ.,* 65 Misc.2d 418, 317 N.Y.S.2d 486, 489 (Sup.Ct.1971).[9] Accordingly, as GSGSB's last service was performed within the statutory period, the cause of action for quantum meruit is not time-barred under the six-year statute of limitations.

## III. Breach of Contract

GSGSB alleges in Count I of its complaint that "[b]etween August, 1984 and November, 1985 various revisions to the GSGSB [draft] agreement were submitted by Yankees legal counsel to the parties culminating in a contract prepared by the Yankees' legal counsel dated November 8, 1985." Complaint, at ¶ 11. The Yankees move for summary judgment on this count, contending that they never executed a written contract with GSGSB. They contend further that the various proposed drafts, correspondence between the parties and GSGSB's conduct reflect that no contract was ever entered into, that the parties never intended to be bound until a formal contract was executed, and that the parties never intended to be bound to any agreement unless and until the City approved the proposed renovations and appropriate financing was obtained.

■ Under New York law, a contract is unenforceable if the parties did not intend to be bound until after the execution of a formal written agreement. *Jim Bouton Corp. v. WM. Wrigley Jr. Co.,* 902 F.2d 1074, 1080 (2d Cir.), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990); *Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir.1985); *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir.1984); *Scheck v. Francis,* 26 N.Y.2d 466,

**9.** In light of *Martin v. Camp,* 219 N.Y. 170, 114 N.E. 46 (1916), the Yankees' argument that *Kramer, Levin, Nessen, Kamin & Frankel v. Aro-* noff, 638 F.Supp. 714 (S.D.N.Y.1986) does not accurately reflect New York law is without merit.

260 N.E.2d 493, 495, 311 N.Y.S.2d 841, 843 (1970). "This rule holds true even if the parties have orally agreed upon all the terms of the proposed contract." *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d at 74. On the other hand, however, where the parties do not intend that an agreement must be reduced to writing to be binding and there are no material terms of the contract left open for negotiation, an informal oral agreement may be binding even if the parties contemplated memorializing their agreement in writing. *Winston v. Mediafare Entertainment Corp.,* 777 F.2d at 80; *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d at 74. Thus, "[w]hat matters are the parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances." *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d at 74.

The Second Circuit has set forth four factors to determine whether the parties intended to be bound prior to executing a written contract. Specifically, the Court is to consider whether: (1) either party has expressly reserved the right not to be bound absent a written agreement; (2) there has been partial performance of the contract; (3) all of the terms of the alleged contract have been agreed upon "such that there is literally nothing left to negotiate or settle;" and (4) the agreement at issue is the type of contract that is generally committed to writing. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d at 75–76; *see also Winston v. Mediafare Entertainment Corp.,* 777 F.2d at 80. These factors may be shown by "oral testimony or by correspondence or other preliminary or partially complete writings." *Winston v. Mediafare Entertainment Corp.,* 777 F.2d at 80 (quoting Restatement (Second) of Contracts § 27 comment c (1981)). After analyzing each of these factors in turn, the Court finds as a matter of law that the parties did not intend to be bound prior to the execution of a writing.

## A. Express Reservation Not to Be Bound

Although no single factor of the four factors listed above is dispositive, *see R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d

at 75, "considerable weight" is placed upon a party's express statement that it intends to be bound only when a written agreement is signed. *Id.* "Courts are reluctant to discount such a clear signal, and it does not matter whether the signal is given during the course of bargaining or at the time of the alleged agreement." *Id.* Although neither party in the case at hand expressly reserved the right not to be bound prior to the execution of a written agreement, the correspondence between GSGSB and the Yankees and communications between the parties indicate that only a formal signing was intended to give rise to a binding contract.

### 1. The Documentary Evidence

The uncontested documentary evidence clearly establishes that the parties intended not to be bound prior to the execution of a formal written contract. First, the very language of the unsigned October 29th, July 30th, August 7th, September 20th and November 8th Drafts makes plain that a formal signing was intended to be essential to give rise to a binding contract. For example, the October 29th Draft is replete with references to the fact that the rights and obligations of the parties are triggered "[u]pon execution of this Agreement" and can only be modified "in writing." *See* the October 29th Draft at ¶¶ 1.1.5, 1.2.1, 1.2.2, 1.3.3, 1.5.9, 1.5.10, 1.5.15, 1.7, 13.1, and 14.1; *see also* the July 30th Draft at ¶¶ 1.1.5, 1.2.1, 1.2.2, 1.3.3, 1.5.9, 1.5.15, 1.7, 13.1, and 14.1; the August 7th Draft at ¶¶ 1.1.5, 1.2.1, 1.2.2, 1.3.3, 1.5.9, 1.5.15, 1.7, 13.1, and 14.1. Neither party ever took exception to these provisions. Moreover, such language "conclusively establish[es]" a mutual intent not to be bound prior to the execution of a written contract. *See Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 262 (2d Cir.), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).

In addition, all five drafts expressly provide that the agreement:

> [R]epresents the entire and integrated agreement between the Owner and Architect and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Architect.

October 29th Draft at ¶ 13.5; July 30th Draft at ¶ 13.5; August 7th Draft at ¶ 13.5; September 20th Draft at ¶ 13.5; November 8th Draft at ¶ 13.5. Where, as here, a draft agreement declares on its face "that 'when duly executed' it would set forth the parties' rights and obligations, that there were no other agreements between the parties and that any modification in the agreement would also have to be in writing and signed," the evidence "unequivocally" supports the position that the parties intended a writing. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d at 76; *see also Reprosystem, B.V. v. SCM Corp.*, 727 F.2d at 262. Thus, the language of the proposed agreements support the Yankees' contention that the parties placed great importance on the formalities of execution.

Second, in addition to the language of the draft agreements, language used in correspondence and other documents also reflects the parties' intent to be bound only if a writing were executed. *Chromalloy Am. Corp. v. Universal Hous. Sys., Inc.*, 495 F.Supp. 544, 550 (S.D.N.Y.1980) (finding no oral contract where "correspondence between the parties not only refers to a written agreement, but expressly disclaims any intention to be bound until execution of such a document"), *aff'd,* 697 F.2d 289 (2d Cir.1982). For example, a letter dated August 15, 1986 from William F. Dowling, the Yankees' then general counsel to GSGSB, states in pertinent part that GSGSB "agreed to and did perform architectural and engineering services on a risk basis to the New York Yankees on the expectation that it would be retained . . . if the New York Yankees determined to construct certain luxury boxes." Moreover, in a memo to the file, Steinbrenner stated that he "never made any agreement with [GSGSB]" and that he "did not believe that Gene McHale had because he would have had to have my consent." *See* letter to file from Steinbrenner of 7/20/86, annexed to the Barie Dec. as Exh. "27." These letters make clear that the Yankees and their attorneys considered the draft agreements to be non-binding proposals, rather than legally enforceable agreements.

### 2. The Oral Testimony

The parties' sworn deposition testimony provides further support for the Yankees' position that a written agreement was intended. Although GSGSB contends that it had a binding, enforceable agreement by virtue of the fact that a draft was allegedly "adopted," a former GSGSB principal conceded at his deposition that GSGSB understood that a writing was necessary to conclude the deal. Specifically, Provini testified that GSGSB continually attempted to get the Yankees to sign a written contract for the Project. *See* Provini Dep. at 29–33. Referring to a copy of the October 29th Draft, Provini stated:

> [T]his is a pretty pure contract, sort of an unedited contract. This is what we would normally try to get from a client, this is not normally what you get back, this what you try to get. So this is probably one of the very first contracts that was put forward in 19—the latter part of 1984.

*Id.* at 31. Additionally, E. Lawrence Bellante ("Bellante") of GSGSB testified that he believed that the October 29th Draft was prepared without any prior negotiations between the parties and as the first step in negotiations towards a written contract between GSGSB and the Yankees. *See* deposition of E. Lawrence Bellante, taken on 2/27/92, annexed to the Bergen Aff. as Exh. "J," at 73–74.

Provini confirmed this testimony. Specifically, Provini testified that when he became GSGSB project manager in October 1984 and realized that there was no written contract between the parties, he immediately arranged to have one drafted, executed by Bellante, and sent to the Yankees. Provini Dep. at 30–31. He also testified that this was GSGSB's standard contract and that he then expected to negotiate the terms thereof with the Yankees. *Id.* at 31. Thus, by GSGSB's own admissions, the various draft documents were merely a first effort to put in writing the terms of a multi-faceted agreement, and were not a binding, legally enforceable contract.

Other deposition testimony confirms that the parties did not intend to be bound until the execution of a formal, written contract.

For example, McHale testified that he told Provini on several occasions that he did not have authority to enter into a binding agreement on behalf of the Yankees without Steinbrenner's approval. *See* deposition of Eugene McHale, taken on 7/29/91, annexed to the Bergen Aff. as Exh. "E," at 188, 319, 396–97, 438, 451–52. Similarly, George Campbell of GSGSB and James Frankel, counsel for the Yankees, confirmed that GSGSB knew that ultimate decision-making authority for the Yankees and ultimate approval of the contract rested with Steinbrenner. *See* deposition of George Robert Campbell, taken on 12/13/91, annexed to the Bergen Aff. as Exh. "H," at 278–79; deposition of James Frankel, taken on 8/5/91, annexed to the Bergen Aff. as Exh. "G," at 158–60. Accordingly, with respect to the first factor, the Court finds that, although neither party expressly reserved the right not to be bound until a written agreement was executed, their draft proposals, correspondence and communications reveal such an intent.

### B. Partial Performance of the Alleged Agreement

The second of the four factors to be considered by the Court is whether one party's partial performance of the alleged contract and the other party's acceptance of that performance shows that both parties understood a contract "to be in effect." *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d at 76. Thus, for example, performance of an agreement for a year was found by this Court to be "strong circumstantial proof that the minds of the parties had met on the essential elements and that they were not waiting for a formal written instrument." *Viacom Int'l Inc. v. Tandem Productions, Inc.*, 368 F.Supp. 1264, 1270 (S.D.N.Y.1974), *aff'd,* 526 F.2d 593 (2d Cir.1975).

In the case at hand, GSGSB contends that its work on the Project constitutes partial performance. GSGSB argues that its involvement in the Project consisted of the creation of 549 drawings, 1,358 pages of document inventory and over 8,000 hours performed by GSGSB personnel. The Yankees do not dispute that GSGSB rendered services in anticipation of completing the Project.

The Yankees contend, however, that such partial performance was done "on the come" as part of a calculated business decision by Gilboy. The Court finds that this factor does not weigh clearly in either party's favor in determining whether the parties intended to be bound prior to the execution of a written contract. Based on the record before the Court, it is unclear whether GSGSB commenced performance based on its belief that an oral contract existed or merely as a calculated risk designed to obtain a contract with the Yankees.

### C. The Existence of Open Terms

The third factor the Court must analyze is whether there was "literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to." *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d at 76 (wherein the existence of one material issue, namely, the territory to be developed under a franchise, was sufficient to support defendants' position that they intended to be bound only by an executed writing). As there were several open terms which were never resolved in the instant case, the Court finds that the Yankees did not intend to be bound by the Draft Agreements.

Specifically, a significant material issue which the parties never resolved was the overall breadth of the Project. The minutes from the May 12, 1986 meeting, which were prepared by GSGSB, state that the scope of work, cost of construction and the possibility of full-time construction observation services remained subject to negotiation. *See* minutes of meeting, dated 5/12/86, annexed to the Barie Dec. as Exh. "26." Also, the minutes of a March 11, 1986 meeting, which were also prepared by GSGSB, state in pertinent part: "[t]he question of what is to be constructed is still open." *See* minutes of meeting, dated 3/11/86, annexed to the Barie Dec. as Exh. "24." "There is a strong presumption against finding binding obligation in agreements which include open terms." *Arcadian Phosphates, Inc. v. Arcadian Corporation,* 884 F.2d 69, 73 (2d Cir.1989) (quoting *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.,* 670 F.Supp. 491, 499 (S.D.N.Y.

1987)). Thus, the Court finds that GSGSB is incorrect in suggesting that there was "literally nothing left to negotiate."

### D. Business Practice

Finally, the Court must determine whether the proposed agreement concerns a complex transaction which as a practical business matter normally would be reduced to writing. *Winston v. Mediafare Entertainment Corp.*, 777 F.2d at 83; *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d at 76. GSGSB contends that it has undertaken any number of projects with reputable clients without having a signed contract in place. According to GSGSB, its clients have tight time constraints, similar to the Yankees' original schedule, and cannot wait for attorneys to negotiate a contract over several months.

In the case at hand, however, the proposed renovations to Yankee Stadium entailed a budget of several million dollars and involved major renovations, including the addition of thirty-six superboxes and a new 300–seat restaurant. *See Winston v. Mediafare Entertainment Corp.*, 777 F.2d at 83 (where $62,500 was at issue, payment was to be made over several years and the parties engaged in substantial redrafting, the fact that the agreement was only four pages in length did not necessarily mean that the settlement agreement was not the type that required a written contract); *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d at 71 ("[W]hen substantial sums of money are at stake it is neither unreasonable nor unusual for parties to require that their contract be entirely in writing and signed before binding obligations will attach."). Moreover, McHale contends that the Yankees made it a practice to ensure that their contracts were eventually reduced to writing. McHale Aff. at ¶ 12.

In addition, the Project at issue was of a substantially complex nature. This is reflected in the fact that at least five draft agreements were negotiated between the parties in 1984 and 1985. Moreover, the parties' understanding was continually reflected in a series of letters and invoices sent between them. Thus, the Court finds that the parties simply could not have intended that the various draft documents and oral understandings constituted a legally enforceable contract. *See Reprosystem, B.V. v. SCM Corp.*, 727 F.2d at 262–63 ("These drafts ... reflect a practical business need to record all the parties' commitments in definitive documents."). Accordingly, as the Court finds that the instant case involved a complex transaction that, as a practical business matter, would have been reduced to writing, the fourth factor also weighs in the Yankees' favor.

In sum, in light of the fact that (1) the documentary evidence clearly establishes that the parties did not intend to be bound prior to the execution of a written agreement; (2) the sworn deposition testimony provides additional support that a written agreement was intended; (3) several significant open terms were left unresolved; and (4) the size and complexity of the Project evidenced the type of contract that is generally committed to writing, the Court finds that there is no genuine issue of material fact that the parties intended to be bound only upon the execution of a signed, written agreement. Accordingly, the Yankees' motion for summary judgment dismissing Count I of the complaint is granted.[10]

### IV. Account Stated Cause of Action

In its complaint, GSGSB seeks recovery for damages on account stated. GSGSB contends that the Yankees are liable for the amounts set forth in the invoices received by the Yankees between 1985 and 1987. Specifically, GSGSB argues that the Yankees' failure timely to object to the invoices or to refuse credits ascribed therein provides a basis for their claim. GSGSB now moves for summary judgment on its account stated claim.

The Yankees disagree with GSGSB's contentions and argue that they are entitled to judgment as a matter of law. Specifically, relying on *Bauman Assocs., Inc. v. H & M*

---

10. As the Court finds that GSGSB's breach of contract claim fails as a matter of law, the Court need not consider the Yankees' further contention that the breach of contract claim is barred by the applicable statute of limitations.

*Int'l Transp., Inc.,* 171 A.D.2d 479, 567 N.Y.S.2d 404 (1st Dep't 1991) (*"Bauman"*) and *Gurney, Becker & Bourne, Inc. v. Benderson Dev. Co.,* 47 N.Y.2d 995, 394 N.E.2d 282, 283, 420 N.Y.S.2d 212, 213 (1979) (*"Gurney"*), the Yankees cross-move for summary judgment on GSGSB's account stated claim on the grounds that (1) the existence of the underlying contract or indebtedness to GSGSB is disputed; and (2) they did not expressly agree to treat the invoices as an account stated. Specifically, the Yankees maintain that GSGSB's account stated claim is nothing more than an attempt by it to collect under an otherwise disputed contract, and that, as this underlying agreement is in dispute, the account stated claim must fail as a matter of law.

In *Bauman,* the New York Appellate Division, First Department, dismissed a claim for account stated, holding that a party may not use an account stated claim as a means to collect under a disputed contract. The court explained that:

> [A]n account stated cannot be made an instrument to create liability when none otherwise exists but assumes the existence of some indebtedness between the parties or an express agreement to treat the statement in question as an account stated. Here, defendant has objected to the purported account stated, and the existence of the underlying contract between the parties has not yet been established.... If plaintiff can prove an enforceable contract, then it will be able to recover under the first cause of action [for breach of contract]. However, as is the situation with the second cause of action in quantum meruit, a claim for an account stated may not be utilized simply as another means to attempt to collect under a disputed contract.

*Id.,* 567 N.Y.S.2d at 408–09 (citation omitted); *see also Gurney, Becker & Bourne, Inc. v. Benderson Dev. Co.,* 47 N.Y.2d 995, 394 N.E.2d 282, 283, 420 N.Y.S.2d 212, 213 (1979) ("The rule that an account which has been rendered and to which no objection has been made within a reasonable time should be regarded as admitted by the party charged as prima facie correct assumes that there exists some indebtedness owing between the parties or an *express agreement* between the parties to treat the statement as an account stated.") (emphasis in original).

*Gurney,* upon which *Bauman* relies, stands for the proposition that a claim for account stated may not create liability where none exists. *See Mount Sinai Hosp. v. Burns,* 133 Misc.2d 707, 507 N.Y.S.2d 964, 968 (Civ.Ct.1986) ("An account stated only determines the amount of debt where a liability exists, but it cannot be made to create a liability where none before existed."), *rev'd on other grounds,* 138 Misc.2d 381, 527 N.Y.S.2d 678 (1st Dep't 1988).

Thus, pursuant to *Bauman* and *Gurney,* the Yankees are entitled to summary judgment if they can demonstrate that (1) the existence of the underlying contract is disputed; and (2) they did not expressly agree to treat the invoices as an account stated. As the Court has found that there is no genuine issue of material fact regarding the underlying indebtedness owing between the parties, the Yankees have proven that the existence of the underlying contract is in dispute. Further, although GSGSB forwarded invoices to the Yankees setting forth various amounts claimed, the record is clear that the Yankees did not agree to treat the invoices as an account stated. The Court finds, therefore, that GSGSB cannot succeed on its claim for account stated as a matter of law. Accordingly, the Yankees' motion for summary judgment with respect to this cause of action is granted and GSGSB's motion is denied.

## V. Failure to Plead Fraud with Particularity

In Count III of the complaint, GSGSB alleges that "GSGSB rendered the professional services to the Yankees in reliance upon numerous promises that the Yankees would pay for the services performed." Complaint at ¶ 29. The complaint suggests further that unnamed persons made various unspecified misrepresentations on behalf of the Yankees "to defraud GSGSB out of its fees and/or otherwise to induce GSGSB to perform and to continue to perform architectural services and engineering services on an expedited basis for the benefit of the Yankees." *Id.* at ¶ 30. Thus, the allegations of

fraud consist of references to the Yankees' unspecified representations presumably designed to induce performance by GSGSB.

The Yankees move to dismiss Count III on the grounds that GSGSB has failed to plead fraud with sufficient particularity. Pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, a plaintiff must allege with specificity facts which give rise to a strong inference that the defendants had an intent to defraud, and knew that their representations were false when made. *Connecticut Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir.1987); *Ross v. A.H. Robins Co.*, 607 F.2d 545, 553 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *Crystal v. Foy*, 562 F.Supp. 422, 425 (S.D.N.Y.1983). Specifically, to satisfy the particularity requirement, a plaintiff is required to indicate "(1) precisely what statements or omissions were made and in what documents or through what oral representations those statements were made; (2) the time and place of each such statement and the persons responsible for making (or, in the case of omissions, for not making) each such statement; (3) the content of such statements and manner in which the statements misled plaintiffs; and (4) what defendants obtained as a consequence of fraud." *Manela v. Gottlieb*, 784 F.Supp. 84, 87 (S.D.N.Y. 1992); *see also Hotel Constructors, Inc. v. Seagrave Corp.*, 574 F.Supp. 384, 388–89 (S.D.N.Y.1983) ("Rule 9(b) requires the pleader to specify precisely what statements were made, when, where and by whom they were made, in what manner the plaintiff was misled, and what the defendant obtained as a consequence.") (citation omitted). Conclusory allegations are insufficient. *Armstrong v. McAlpin*, 699 F.2d 79, 93 (2d Cir.1983) ("Generalized and conclusory allegations of fraudulent concealment did not satisfy requirements of [Rule 9(b) of the] Federal Rules of Civil Procedure.").

Moreover, New York courts have rejected allegations that attempt to convert breach of contract actions into fraud claims.

> Breach of promise sounds in contract, not fraud. A contract action may not be converted into one for fraud by the mere additional allegation that the contracting party did not intend to meet his contractual obligation.

*Comtomark, Inc. v. Satellite Communications Network, Inc.*, 116 A.D.2d 499, 497 N.Y.S.2d 371 (1st Dep't 1986); *see also Paper Corp. of United States v. Schoeller Technical Papers, Inc.*, 759 F.Supp. 1039, 1044–45 (S.D.N.Y.1991) ("a claim for fraud will be dismissed when the only fraud charge relates to a breach of contract") (citing *Trusthouse Forte (Garden City) Management, Inc. v. Garden City Hotel, Inc.*, 106 A.D.2d 271, 483 N.Y.S.2d 216, 218 (1st Dep't 1984)); *Spellman v. Columbia Manicure Mfg. Co.*, 111 A.D.2d 320, 489 N.Y.S.2d 304, 307–08 (2d Dep't 1985) ("no cause of action for fraud arises 'when the only fraud charged relates to a breach of contract.'") (citation omitted).

The Yankees contend that GSGSB's fraud claim consists of nothing more that a restated contract claim. In fact, GSGSB's claim is merely a vague and unspecified allegation that it relied "upon numerous promises that the Yankees would pay for the services performed," and that the "Yankees directed GSGSB to continue performance of its work while the Yankees incorporated into the parties agreement various understandings and directions between GSGSB and the Yankees." Complaint at ¶ 29. GSGSB nowhere specifies the precise content of the representations on which it is entitled to relief, the time and place of such representations, the persons responsible for making them or the manner in which they were misled. Aside from a bare, conclusory allegation that "[t]he Yankees knowingly, maliciously, fraudulently, designedly and deceitfully made false representations of material fact to GSGSB," *id.* at ¶ 38, the complaint is literally devoid of any factual allegations to support an inference that the Yankees knowingly made any fraudulent misrepresentations.

Non-compliance with Rule 9(b) is not fatal, however, in view of the liberal amendment policy underlying Rule 15, which states that leave to amend "shall be freely given when justice so requires." *See Hunter v. H.D. Lee Co.*, 563 F.Supp. 1006, 1012 (N.D.N.Y.1983). Accordingly, Count III of the complaint is dismissed without prejudice and GSGSB is granted leave to file an amended complaint within twenty days from the date of this Memorandum Opinion and Order.

## CONCLUSION

For the reasons stated above, GSGSB's motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the grounds that there is no genuine issue of material fact as to Count II (quantum meruit) and Count IV (damages on account stated), is denied. The Yankees' cross-motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, with respect to Count I (breach of contract) and Count IV (account stated), is granted. The Yankees' cross-motion for partial summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, with respect to Count II (quantum meruit), is denied. GSGSB's motion to dismiss Count III (fraud), pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, is granted and Count III is dismissed without prejudice. GSGSB is granted leave to amend its complaint within twenty days from the date of this Memorandum Opinion and Order. The parties are directed to appear before this Court for a pre-trial conference on Wednesday, November 2, 1994, at 2:00 p.m.

SO ORDERED.