**SEIDEN ASSOCIATES, INC., Plaintiff,**

v.

**ANC HOLDINGS, INC. and American National Can Company, Defendants.**

**No. 90 Civ. 5130 (MBM).**

United States District Court, S.D. New York.

July 8, 1991.

Daniel A. Pollack, Pollack & Kaminsky, New York City, for plaintiff.

Jeremy G. Epstein and Michael W. Jahnke, Shearman & Sterling, New York City, for defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff Seiden Associates, a New York executive recruiting firm, sues for a portion of its fee allegedly earned by causing William N. Sick, Jr. to be hired as chief executive officer of American National Can Company ("Can"), a Delaware Corporation with its principal place of business in Chicago. In an earlier opinion published at 754 F.Supp. 37, I denied defendants' motion to dismiss plaintiff's quantum meruit and unjust enrichment claims because the existence of a written contract governing the same subject matter did not, as a matter of law, preclude quasi-contractual recovery from entities that were not parties to the contract. Both sides have now moved for summary judgment on plaintiff's contract claims. For the reasons set forth below, defendants' motion for summary judgment is granted. In addition, because it is now clear that defendant ANC Holdings Inc. (ANC) is a successor-in-interest to a party to the original contract, plaintiff's unjust enrichment and quantum meruit claims are also dismissed.

### I.

On December 2, 1986, Seiden entered into a contract dated October 31, 1986 with Triangle Industries Inc. to recruit a Chief Executive Officer for Triangle's container business. Plaintiff's Rule 3(g) Statement ¶ 2. ANC is a successor-in-interest to Triangle. *Id.* ¶ 3; Stelzel Aff. ¶ 16. The contract, which plaintiff drafted, provided that it would be compensated as follows:

Our fee for this assignment, which shall be an exclusive one, will be equivalent to 30% (thirty percent) of the executive's first year's earned base and incentive compensation, reduced by the paid portion of our retainer but not lower than the total retainer, as set forth in the

following paragraph. The final fee will be determined 12 months from the date of employ.

As such retainer, Triangle Industries Inc. agrees to pay Seiden Associates $300,000 (three hundred thousand) in five equal monthly payments of $60,000 (sixty thousand) beginning on the date this letter is signed by you. This retainer is based on 30% of the Chief Executive Officer's initially estimated first year's total cash compensation of $1 million.

When the Chief Executive Officer of your container business is hired, we shall be entitled to the unpaid balance of our $300,000 retainer, which shall be nonrefundable.

Seiden Aff., Exh. A.

During 1987, Seiden contacted and evaluated over 100 candidates for the position and eventually recruited William N. Sick, Jr. to serve as Chief Executive Officer of Can, effective January 1, 1988. Plaintiff's Rule 3(g) Statement ¶ 6. Seiden assisted Sick in negotiating the terms of his employment. Defendants' 3(g) Statement ¶ 10. Sick and Can eventually agreed to a five-year employment agreement, dated January 1, 1988, which provided that Sick would receive an annual salary of $800,000 and would be "eligible to receive a cash bonus award up to an amount equal to 100% of the actual salary payable ... for such year." Stelzel Aff., Exh. F. § 2.1.2. The agreement further provided that the cash bonus "shall be based upon the achievement, as determined by ... [Can's] Board of Directors in the exercise of its reasonable judgment" of certain company and individual performance goals set by Can's Board at the beginning of the year and that it would "be payable in a lump sum on or before each April 1 for the immediately preceding calendar year." *Id.* Thus, Sick's right to receive the bonus was subject to the Board's reasonable discretion and was payable any time on or before April 1 of the following year. Defendants' Rule 3(g) Statement ¶ 12. In addition to this discretionary bonus, Sick was also eligible to receive compensation from a Deferred Performance Incentive Plan and two

stock option plans. Stelzel Aff., Exh. F §§ 2.1.3, 2.1.4.

Sick started employment with Can on January 1, 1988. Stelzel Aff. ¶ 3. According to Sick's 1988 W–2 form, Sick was paid total cash compensation of $800,004 during calendar year 1988. In addition to cash compensation, Sick's W–2 also shows $4,700 for "tax preparation," $173,437.50 for "stock option[s]," and $45,189.67 for "moving expense." Stelzel Aff., Exh. A. Thus, his total 1988 earnings, before 401–K contributions, was $1,023,331.17. Meanwhile, during 1988, both Triangle and its subsidiaries, including Can, were sold to the Pechiney Group. Stelzel Aff. ¶ 15. As mentioned, defendant ANC is a successor-in-interest to Triangle. Id. ¶ 16; Plaintiff's Rule 3(g) Statement ¶ 2. Pechiney Group apparently became the parent of both defendants as a result of the sale.

On March 1, 1989, the Chairman of Pechiney, Jean Gandois, determined that Sick should be granted a discretionary bonus of $1 million. Seiden Aff. ¶ 7, Exh. C; Stelzel Aff. ¶ 18. There is no dispute that this bonus was applicable to Sick's performance during 1988, and could therefore be considered "earned" during that year. However, it is also undisputed that neither defendant was obligated to pay that bonus, nor was Sick entitled to receive it, until March 1, 1989.

The Annual Report on Form 10–K filed by Trian Holdings, Inc., apparently another successor of Triangle (Seiden Aff. ¶ 5), shows that for the year ended December 31, 1988, Sick was paid "Cash Compensation" of $2,041,206. Seiden Aff., Exh. B. There is no dispute that this amount includes Sick's $1 million discretionary bonus, id. ¶ 7, as well as the other items on his W–2 form.[1]

The dispute in this case is straightforward. Seiden contends that, under its contract, it is entitled to a total placement fee of $612,361.80, which it calculates by multiplying Sick's "cash compensation" set forth in the annual report by 30%. Because Seiden already has received a $300,000 advance retainer, it sues for the remainder of $312,-361.60. In particular, Seiden contends that the $1 million discretionary bonus, determined by Gandois on March 1, 1989, should be used in calculating the total fee. On the other hand, defendants contend that the contract clearly and unambiguously provided that the final fee was to be determined 12 months from the date of employ and that, therefore, only amounts which Can had paid or was obligated to pay Sick as of December 31, 1988 (the "final fee date") were to be used in calculating Seiden's final fee. Defendants contend that Sick's 1988 cash compensation of $800,004, as set forth in his W–2 form, is the only item relevant to the fee calculation. Therefore, defendants assert that because 30% of that amount, $240,001.20, is less than the amount already paid, Seiden is not entitled to an additional fee. Moreover, defendants contend that the term "incentive cash compensation"—as used in the contract—referred to a specific type of long-term cash incentive available to Can management, namely the "Deferred Performance Incentive Plan," and did not include the $1 million discretionary bonus.

## II.

Under Fed.R.Civ.P. 56(c), a trial judge must grant summary judgment if the evidence demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all reasonable inferences, against the moving party. *United*

---

1. As noted, Sick's total compensation on his W–2 form, before taking into account 401–K contributions, was $1,023,331. According to a footnote in the annual report, this amount—less $45,190 in moving expenses—as well as the $1 million discretionary bonus were included in the $2,041,206 total "cash compensation" amount listed in the annual report. Seiden Aff., Exh. B. Since those amounts only add up to $1,978,141, it appears that the remaining $63,-065 consists of employer pension contributions, which the footnote indicates are also part of the "cash compensation" amount. *Id.*

*States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam), *cited in Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987).

The mere existence of disputed factual issues is insufficient to defeat a motion for summary judgment. *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11–12 (2d Cir.1986). The disputed issues of fact must be "material to the outcome of the litigation," *Knight*, 804 F.2d at 11, and must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* With respect to materiality, "the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

Summary judgment may be appropriate in contract actions where the language of the relevant agreement is unambiguous. Under New York law, which governs this dispute, if a contract is unambiguous on its face, its proper construction is a question of law. *United States Naval Institute v. Charter Communications, Inc.*, 875 F.2d 1044, 1048 (2d Cir.1989). Furthermore, extrinsic evidence is inadmissable to contradict an unambiguous contract.

"Contract language is unambiguous if it has 'a definite and precise meaning unattended by the danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion.' Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretation in the litigation. The court should not find the language ambiguous on the basis of the interpretation urged by one party, where that interpretation would 'strain the contract language beyond its reasonable and ordinary meaning.'

"The parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable. In its efforts to preserve the parties' rights and the status quo, the court must be careful not to alter the terms of the agreement. 'The parties having agreed upon their own terms and conditions, the courts cannot change them and must not permit them to be violated or disregarded.' "

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990) (*quoting Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280, 1282–83 (1978); *Bethlehem Steel Co. v. Turner Construction Co.*, 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 93, 141 N.E.2d 590, 593 (1957) and *Diversified Mortgage Investors v. U.S. Life Title Ins. Co. of New York*, 544 F.2d 571, 575 (2d Cir.1976)) (citations omitted).

The contract at issue is unambiguous. Neither the language nor the inferences from that language are "reasonably susceptible to more than one meaning." *Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 (2d Cir.1990). The contract explicitly states that those only those items of Sick's "first year's earned base and incentive cash compensation," which amounts were ascertainable "12 months from [Sick's] date of employ," are relevant to the calculation of Seiden's final fee.

As mentioned, the contract provided that Seiden's fee would be:

... equivalent to 30% ... of the executive's first year's earned base and incentive compensation, reduced by the paid portion of our retainer but not lower than the total retainer.... *The final fee will be determined 12 months from the date of employ.*

(emphasis added) The contract terms are clear. Seiden's fee was to be the greater

94

of either the retainer *or* 30% of Sick's "first year's earned base and incentive cash compensation" as *"determined 12 months from the date of employ."* (emphasis added) The latter phrase (the "final fee provision") is crucial. On that date, "12 months from the date of employ," Seiden would multiply the amount of the executive's first year's total ascertainable "earned base and incentive cash compensation," by 30%, in order to "determine[ ]" its "final fee."

■ That final fee provision is easily applied to the facts in this case. Because Sick commenced employment with Can on January 1, 1988, the final fee date was December 31, 1991. According to his W–2 form, Sick's "first year's earned base ... compensation," as of December 31, 1988, was exactly $800,004. However, as of that date, there was no ascertainable "incentive cash compensation." The remaining items included on the 1988 W–2 form, namely tax preparation, moving expenses, and "stock options"—totalling to $223,327—are not "incentive cash compensation." Thus, although plaintiff's claim is based on the $2,041,026 amount shown on the annual report, $223,327 is not relevant to the fee calculation. Accordingly, the only material dispute in this case concerns the status of the discretionary bonus, because Sick's total "base and incentive cash compensation" cannot exceed the $1 million threshold required to earn an enhanced fee unless that bonus is included.

For purposes of these motions, I will assume that the term "incentive cash compensation" includes the discretionary bonus. Sick certainly "earned" that bonus in 1988, because the bonus rewarded performance rendered during that year. However, ANC was not obligated to pay Sick a bonus of $1 million, nor for that matter any discretionary bonus, until March of 1989, when Gandois, the Chairman of defendants' parent company, decided to grant the bonus. Plaintiff admits that the bonus was "granted" on March 1, 1989 (Seiden Aff. ¶ 7), and makes no claim that the amount was somehow "determin[able]" (in the words of the contract) on December 31, 1988, the final fee date. Therefore, under the plain terms of the final fee provision,

the discretionary bonus, although earned in 1988, should not be used to calculate Seiden's final fee. Accordingly, because the $300,000 retainer exceeds 30% of the "first year's earned base and incentive cash compensation" ascertainable as of December 31, 1988 ($240,001), Seiden is not entitled to any additional fee.

■ By ignoring the final fee provision, Seiden fails to provide any interpretation— let alone a reasonable one—to contradict the plain meaning of the contract: the full *amount* of the fee would be conclusively determined on the first anniversary of the executive's employment. Seiden might have argued that the final fee provision states only the date when the parties would determine which *types* of compensation would be included in the fee calculation, rather than the date for ascertaining the final fee *amount*. Seiden fails to establish a basis for this—or any other fact based argument—in its Local Civil Rule 3(g) Statement, to controvert defendants' assertion that "[p]laintiff's final fee under the Letter Agreement was the greater of its $300,000 retainer or 30% of the base and incentive compensation received by the executive within the first 12 months of the executive's employ." Defendants' Rule 3(g) Statement ¶ 9. Seiden's only response to that assertion is a suggestion to "[s]ee the contract at issue for a fair reading of its terms." Plaintiff's Response to Defendants' Rule 3(g) Statement on Cross–Motion. That perfunctory response fails to comply with the Local Rule's requirement that the "papers opposing a motion for summary judgment ... include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." Accordingly, defendants' statement has not been "controverted" and is "deemed to be admitted." *See Amsler v. Corwin Petroleum Corp.,* 715 F.Supp. 103, 105 (S.D.N.Y.1989).

■ However, even if Seiden had made the argument that the final fee provision set forth only the date when the parties would determine which *types* of compensa-

tion were included in the fee calculation, that is not a reasonable reading of the contract. The contract states that the *"fee ... will be equivalent"* to 30% of the first year's compensation, and, in the critical passage, that "[t]he final fee will be determined 12 months from the date of employ." Thus, the term "fee" unambiguously means the *amount* of the fee. Therefore, the "final fee [to] be determined" includes only amounts that are ascertainable on the first anniversary of Sick's employ and the $1 million discretionary bonus awarded March 1, 1989, not so ascertainable, is irrelevant to the final fee calculation.

By ignoring the final fee provision, Seiden ignores a material part of the contract executed in late 1986. At that time, a candidate had not been recruited and neither party could foresee the structure of the final executive compensation package. The final fee provision and the provision for a minimum fee—*i.e.* the retainer—eliminated potential uncertainty and risk for both contracting parties as to the potential fee for Seiden's services. The final fee provision provided an objective measure of which compensation items arguably "earned" during the first year of employment should be included in calculating the fee. For example, without the final fee provision, an executive receiving a lump-sum bonus at the end of five years, pursuant to an incentive cash compensation plan requiring full attainment of a five-year plan, could arguably have "earned," in the first year of employment, either (1) 20% of the full bonus, based on principles of straight-line amortization, (2) zero, based on the fact that the bonus did not vest until the end of the fifth year, or (3) some other amount, based on the percentage of the five-year goal achieved in the first year. The final fee provision could not more clearly provide the only basis for fully and finally calculating *the* essential term of the contract—the consideration Seiden would receive for successfully recruiting an executive.

 Seiden's President argues that "[m]y clear understanding with defendants' predecessor-in-interest, Triangle ...," was that my firm was entitled to 30% of Sick's salary and bonus for 1988, whether the bonus was determined and paid in 1989 or, indeed, whenever the bonus was paid, so long as it was referable to Sick's 1988 compensation." Seiden Aff. ¶ 8. Seiden also offers the affirmation of Peter May, the executive who executed the contract on behalf of Triangle, that "[i]t was my clear understanding that Seiden Associates was to receive 30% of Sick's salary and cash bonus attributable to 1988 (i.e. his first year of employment with ANC), even though Sick's cash bonus attributable to 1988 would actually be determined and paid in 1989." May Aff. ¶ 7. This extrinsic evidence is inadmissible in the face of a clear and unambiguous contract provision. *RJR Nabisco, Inc.*, 906 F.2d at 889; *see also Namad v. Salomon, Inc.*, 74 N.Y.2d 751, 753, 545 N.Y.S.2d 79, 80, 543 N.E.2d 722, 723 (1989) ("[p]arol evidence is inadmissible if a contract is clear on its face and sufficient alone to divine the intent of the parties"). Moreover, Seiden's offer of extrinsic evidence to support its claim for 30% of any cash bonus paid to Sick and earned in his first year—"whenever ... paid" (Seiden Aff. ¶ 8) or "even though it would be determined and paid [the following year]" (May Aff. ¶ 7)—would render the final fee provision superfluous. "An interpretation 'that gives a reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect.'" *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 27 (2d Cir.1988) (*quoting Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir.1985)). Therefore, I have disregarded this evidence.

Plaintiff claims that failing to award it a fee for Sick's discretionary bonus "would make a mockery of the contract" because "the defendants had complete control of when they determined and paid Sick's 1988 bonus." Seiden Aff. ¶ 9. Plaintiff's argument is meritless. On the contrary, limiting the fee to 30% of the incentive cash compensation ascertainable on December 31, 1988 honors the contract's clear and unambiguous language. Seiden collected, in advance, a substantial nonrefundable re-

tainer as its estimated fee. Therefore, the plain terms of the contract do not "place plaintiff totally at the mercy of the defendants ... [or] render[ ] the contract's language on the 'incentive cash compensation' illusory." Plaintiff's Reply Brief at 6. Seiden provides no evidence to suggest that defendants deliberately waited until March to determine Sick's discretionary bonus so as to avoid paying an enhanced fee, or that defendants otherwise breached the covenant of good faith and fair dealing implied in every contract. *Carvel Corp. v. Diversified Mgmt. Group, Inc.*, 930 F.2d 228, 230 (2d Cir.1991).

Considering the wide variety of possible incentive compensation plans, the fact that there may be a lag between the year a bonus is "earned" and the year it is "determined and paid" (in the words of plaintiff's President) should have been foreseeable to a professional executive recruiter such as Seiden. The result plaintiff now seeks could easily have been reached by wording the contract differently.[2] It is not my role to rewrite contracts in order to produce—in hindsight—a more advantageous result for one party. *See United States v. 0.35 of an Acre of Land*, 706 F.Supp. 1064, 1072 (S.D.N.Y.1988) ("In effect, [plaintiff] argues[s] that because the parties did not agree to terms that it believes wise, the contract is ambiguous."); *Libra Bank Ltd. v. Banco Nacional de Costa Rica, S.A.*, 570 F.Supp. 870, 893 (S.D.N.Y.1983) ("where there is no inherent ambiguity, courts should not, under the guise of judicial construction, reach an artificial interpretation in order to relieve a party from an improvident bargain"); *Bregoff v. Rubien*, 12 A.D.2d 92, 93–94, 208 N.Y.S.2d 348, 350 (1st Dep't 1960), *aff'd*, 10 N.Y.2d 763, 219 N.Y.S.2d 611, 177 N.E.2d 52 (1961) ("Ambiguity may not be imported, where none exists, for the purpose of extending the terms of a contract to include matters not specifically mentioned—whether deliberately omitted or done so inadvertently through lack of prescience.").

Seiden's only response to the clear and unmistakable language of the final fee provision is that "[d]efendants' *sole* defense to the claim is their misplaced reliance on the sentence...." Seiden Aff., at n. 1 (emphasis in original). However, Seiden fails to explain why that reliance is "misplaced" or provide any alternative explanation for the very provision that defeats its claim as a matter of law. Nor is there anything anomalous about relying on one sentence in a contract if that sentence happens to contain the relevant and dispositive language, as this one does. Accordingly, defendants' cross-motion for summary judgment on plaintiff's contract claim is granted.

### III.

■ Plaintiff's remaining causes of action are based on quantum meruit and unjust enrichment. As I hinted in my earlier opinion, quantum meruit and unjust enrichment are not separate causes of action. 754 F.Supp. at 38 n. 1. Rather, unjust enrichment is a required element for an implied-in-law, or quasi contract, and quantum meruit, meaning "as much as he deserves," is one measure of liability for the breach of such a contract. Black's Law Dictionary (5th ed.); *see Clark–Fitzpatrick, Inc. v. Long Island R.R.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190, 193 (1987) (describing unjust enrichment of defendant as an element of plaintiff's quasi contract claim); 22 N.Y.Jur.2d, *Contracts*, § 447, at 376 (1982) (describing unjust enrichment as a prerequisite for an action on a quasi contract); *see also New York v. SCA Services, Inc.*, 761 F.Supp. 14, 15 (S.D.N.Y.1991) (restitution is a remedy for unjust enrichment, not a separate basis for liability). Therefore, I consider plaintiff's second and third causes of action to be a single claim for recovery on an implied-in-law contract.

■ In this case, Seiden and ANC, Triangle's successor-in-interest, are bound by the written contract. At the time I denied

---

**2.** Because the language in the contract is clear and unambiguous, it is unnecessary to consider applying principles of *Contra Proferentum* to construe that language against the drafter, in

this case Seiden. *Jacobson v. Sassower*, 66 N.Y.2d 991, 993, 499 N.Y.S.2d 381, 382, 489 N.E.2d 1283, 1284 (1985).

defendants' earlier motion to dismiss plaintiff's quantum meruit and unjust enrichment claims, defendants' had denied plaintiff's allegation that ANC was formerly "known as Triangle." Complaint ¶ 2; Answer ¶ 2. Thus, it was unclear from the initial pleadings whether defendant ANC was bound by the terms of the written agreement between Seiden and Triangle. However, defendants' subsequently amended their answer to clarify that although ANC was not formerly "known as Triangle," as alleged in the complaint, it was a "successor to Triangle." Amended Answer ¶ 3. Therefore, ANC is bound by the written contract between Seiden and Triangle and under the rule of *Clark–Fitzpatrick*, 70 N.Y.2d at 388, 521 N.Y.S.2d at 656, 516 N.E.2d at 193, Seiden may not receive, on a quasi contract, relief that it cannot receive under the written contract that defines fully the parties' rights and duties. *See Radio Today, Inc. v. Westwood One, Inc.*, 684 F.Supp. 68, 71 (S.D.N.Y.1988) (denying quasi contract recovery for defendant's alleged breach of contract to pay for use of radio format developed by plaintiff where contract by its terms involved only payment for radio programs produced by plaintiff); *Chadirjian v. Kanian*, 123 A.D.2d 596, 598, 506 N.Y.S.2d 880, 882 (2d Dep't 1986) (dismissing quasi contract claim "where there is a valid express agreement between the parties which explicitly covers the same subject matter"). Accordingly, Seiden's second and third claims for relief against ANC are barred as a matter of law.

■ Plaintiff is also not entitled to quasi contract relief from Can—Sick's immediate employer. Seiden chose to contract with the parent corporation, Triangle, when it agreed to recruit an executive for the parent's container business. My earlier opinion promised that I would reject " 'an attempt to get through the back door a claim this Court would not allow through the front.' " 754 F.Supp. at 41 (quoting Judge Walker in *Adler & Shaykin v. Wachner*, 721 F.Supp. 472, 478 (S.D.N.Y.1988)). Because its contract claim against the parent's successor is barred under the clear terms of the written contract, Seiden may

not pursue quasi contract remedies against the subsidiary. Therefore, plaintiff's second and third claims for relief against Can are barred as a matter of law.

For the reasons set forth above, plaintiff's motion for summary judgment is denied. Defendants' cross-motion for summary judgment is granted.

SO ORDERED: