Leroy T. THAYER, Plaintiff,

v.

DIAL INDUSTRIAL SALES, INC., Charles A. McDonnell, Fergus Fitzgerald and Jerrold B. Spiegel, Defendants.

No. 96 Civ. 0773(WCC).

United States District Court, S.D. New York.

March 6, 2002.

tunity to be heard. 18 U.S.C. §§ 3664(d)(5) and (e).

Schwartz Simon Edelstein Celso & Kessler, LLP, Florham Park, New Jersey, for plaintiff, Stephen J. Edelstein, of counsel.

Frankfurt Garbus Kurnit Klein & Selz, P.C., Dial Industrial Sales, Inc. and Charles A. McDonnell, New York City, Edward Hernstadt, Andrew D. Patrick, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Plaintiff Leroy T. Thayer brings this action against defendants Dial Industrial Sales, Inc. ("Dial"), Charles A. McDonnell, Fergus Fitzgerald and Jerrold B. Spiegel[1] for common law fraud, detrimental reliance, *quantum meruit* and unjust enrichment. On November 22 and November 24, 2001, this Court conducted a bench trial. Pursuant to an Opinion and Order of this Court dated February 23, 2000, plaintiff's claim for damages is limited to the period of June 1992 through March 1, 1993 for Counts Four through Seven in the Amended Complaint. Familiarity with that opinion is presumed. For the reasons to follow, we enter judgment in favor of plaintiff in the amount of $25,000. Pursuant to Fed.R.Civ.P. 52(a), we set forth below our findings of fact and conclusions of law.

## FINDINGS OF FACT

In or about May 1991, McDonnell, a citizen of the State of New York, incorporated Dial in New York. (Trial Tr. at 265.) McDonnell's plan was for Dial to manufacture and sell an innovative new product he and Fitzgerald hoped to discover. (*Id.* at 266–67.) McDonnell and Fitzgerald selected the name Dial, an acronym for Fitzgerald's successful Irish company, Dublin Industrial Auctions Limited. (*Id.* at 266.) McDonnell is the President, majority shareholder and a Director of Dial. Fitzgerald, during the relevant time period, was a Director, Vice President and shareholder.

---

1. At the conclusion of plaintiff's case, this Court granted Spiegel's motion to dismiss all claims for want of any showing of a promise or misrepresentation made by Spiegel to plaintiff. Plaintiff's claims against Fitzgerald were dismissed pursuant to this Court's Opinion and Order dated February 23, 2000.

After evaluating and rejecting a variety of products, in or about January 1992 Fitzgerald learned of a telescoping ladder through associates in Ireland who were manufacturing it for sale in Europe. (*Id.* at 267–68.) Fitzgerald notified McDonnell, who flew to Ireland in April 1992 to investigate. (*Id.* at 268.) After touring the factory where the ladder was being produced, McDonnell returned to the United States with several sample ladders and sought the opinions of former colleagues and friends. (*Id.* at 269.) McDonnell also visited two testing labs to determine whether the ladders, which he knew did not satisfy the safety standards of the American National Standards Institute ("ANSI"), could be modified and adapted to meet ANSI standards. (*Id.* at 269–70.) At some time during this period, McDonnell and Fitzgerald decided to commit Dial to the manufacture and sale of the telescoping ladders.

Plaintiff, a citizen of the State of New Jersey, has a *juris doctor* degree and has completed two-thirds of the credits necessary to obtain a masters degree in business administration. (*Id.* at 3–4.) From 1975 through 1977, plaintiff was employed as a contracts manager at Western Information Systems in Mahwah, New Jersey. (*Id.*) From 1977 to 1984 he worked for Diagnostic Retrieval Services as Vice President of Contracts, Program Management and Administration and from 1984 to April 5, 1992, plaintiff was employed by TimePlex, Inc., ultimately as an Administrative Vice President for Contracts and Sales Administration. (*Id.* at 4–5.) While at TimePlex, plaintiff oversaw a department consisting of five or more attorneys and fifty word processing employees. (*Id.* at 5.) His department was responsible for negotiating and reviewing sales contracts and administration of the sales commission plans. (*Id.*) After falling victim to corporate downsizing, plaintiff was provided, in his departure agreement, with six months of outplacement services at Drake Beam Morin ("Drake"), a company that specializes in finding new employment for recently unemployed executives. (*Id.* at 5–6.) The agreement further specified that if plaintiff did not find permanent employment within the initial six months, TimePlex would continue to pay for Drake's services for up to one year. (*Id.* at 76.) During the relevant time period, McDonnell was also a temporary tenant at Drake after his former employer of 25 years, Technicon Corporation ("Technicon"), decided to downsize in April 1992.

## I. *The Alleged Oral Agreement*

In mid–June 1992, McDonnell was introduced to plaintiff by a former Technicon colleague. (*Id.* at 271–72.) Over the next few days, plaintiff and McDonnell had several conversations during which plaintiff learned about the telescoping ladder project. The specific content of these conversations is hotly disputed. Plaintiff testified that McDonnell offered plaintiff a fifty percent (50%) equity interest in the project and a $10,000 monthly salary. (*Id.* at 10–11.) The initial payment was to be made in February 1993 for all salary accrued from June 1992. (*Id.* at 11.) Plaintiff was also to receive a performance-based bonus between sixty percent (60%) and one hundred percent (100%) of his salary as well as normal benefits. (*Id.*) Although there was no specific bonus structure, plaintiff claims that there were specific performance goals to be accomplished, such as finalizing a licensing agreement, testing the product and finding a manufacturer. (*Id.* at 147.) Plaintiff testified that this entire agreement was established within two or three days of his initial meeting with McDonnell. (*Id.* at 12.) Plaintiff alleges that McDonnell never told plaintiff of the existence of Dial or

that it was owned in part by Fitzgerald. (*Id.* at 15.) Plaintiff argues that based on these promises he accepted the terms of the oral agreement and began work on behalf of Dial.

Plaintiff testified that he first learned of the existence of Dial and of Fitzgerald in July 1992 when he was informed that Fitzgerald had a fifteen percent (15%) interest in Dial, and that McDonnell and plaintiff would each own one half of the remaining eighty-five percent (85%) interest. (*Id.* at 17, 19.) In September 1992, McDonnell informed plaintiff of a further modification of the alleged oral agreement, specifically that McDonnell and Fitzgerald would control the majority of shares in Dial, and that plaintiff would be given a twenty-seven and one-half percent (27.5%) equity interest. (*Id.* at 25.) Plaintiff acquiesced in both of these alleged modifications and understood that each new agreement replaced the old. (*Id.* at 98.)

Defendants, not surprisingly, recount a vastly different agreement with plaintiff. Defendants contend that plaintiff learned of the existence of Dial and the telescoping ladder over the course of several weeks. McDonnell testified that he told plaintiff at their first meeting about the creation of Dial and of his partnership with Fitzgerald. (*Id.* at 272.) McDonnell also told plaintiff that the ladder could not meet applicable ANSI standards and that it would be some time, at least eighteen months, before they would be able to generate any revenue from sales. (*Id.*) Defendants dispute that plaintiff was ever offered a fifty percent (50%) interest in Dial or that any specific compensation terms were established. (*Id.* at 273.) McDonnell testified, in particular, that plaintiff was never promised $90,000 payable on February 1993. (*Id.*) Nonetheless, plaintiff believed that the ladder was a quality product and that the venture had promise and therefore agreed to begin work on behalf of Dial with the hope and anticipation of being compensated in the future.

We find defendants' version of the facts to be more credible than plaintiff's. Plaintiff's claim that he was offered full partnership in Dial within the first two or three days of meeting McDonnell is implausible. It is unlikely that McDonnell would proffer such a generous offer without consulting his business partner of several years and without a thorough evaluation of plaintiff's work. Furthermore, we found McDonnell to be an articulate and credible witness. Plaintiff has offered no tenable explanation why McDonnell would conceal the existence of Dial and Fitzgerald. We also find it dubious that plaintiff, a non-practicing lawyer well versed in contract terms, would never reduce his oral agreement with McDonnell to writing, especially in light of his allegations that his equity position was so drastically reduced. Nonetheless, no such writing, however informal, exists and plaintiff has little support for his claims other than his own word.

Spiegel's testimony further corroborates defendants' rendition of the facts. Spiegel has a *juri doctor* degree from New York University School of Law and is now a partner at the law firm of Frankfurt, Garvis. (*Id.* at 214–15.) Like plaintiff, Spiegel learned of the existence of Dial when he met McDonnell in or about June 1992. (*Id.* at 215.) However, Spiegel's testimony as to the content of his conversations with McDonnell differs greatly from plaintiff's version of his interactions with McDonnell. McDonnell informed Spiegel of the existence of Dial, that it had no formal shareholders and that Fitzgerald was his partner. (*Id.* at 218.) Spiegel met plaintiff shortly thereafter and disputes plaintiff's contention that plaintiff was introduced to him as McDonnell's partner. (*Id.* at 219.) Spiegel was not informed of any salary or

equity agreements between McDonnell and plaintiff at that time. (*Id.*) This Court finds Spiegel to be a credible witness. Spiegel was situated similarly to plaintiff upon his initial meeting with McDonnell, yet testifies to a conversation with McDonnell that substantially supports McDonnell's version of the events. We find this persuasive evidence of the truth of McDonnell's statements regarding the alleged promises made to plaintiff.

## II. *June 1992 Through February 30, 1993*

Plaintiff began working for Dial in June 1992. (*Id.* at 14.) It is undisputed that at this early stage a number of tasks necessarily had to be completed before Dial would be able to generate revenue. Most importantly, a final license agreement had to be negotiated with the European patent owners. (*Id.* at 277.) The other important tasks included, *inter alia,* obtaining affordable products liability insurance, meeting United States safety standards for ladders under ANSÍ, developing a business and marketing plan and finding manufacturing and testing facilities. (*Id.* at 14, 18, 277.) Throughout June, plaintiff dedicated approximately fifty percent of his time to Dial. (*Id.* at 15.) He assisted in numerous tasks, most notably developing the marketing plan and assisting McDonnell in finding a manufacturer for the ladders. (*Id.* at 14.)

Beginning in July 1992, plaintiff devoted his time almost exclusively to Dial.[2] (*Id.* at 17–18.) His tasks included meeting with Spiegel at his New York City office, daily meetings with McDonnell, searching for products liability insurance, negotiating with marketing research firms and investigating potential manufacturing firms. (*Id.* at 18–20.) Plaintiff performed similar work throughout the month of August. (*Id.* at 20–21.) In September 1992, plaintiff worked extensively with Spiegel to negotiate the licensing agreement with the European patent holders. (*Id.* at 24, 242–45.) Spiegel's billing records indicate extensive contact with plaintiff throughout the month of September. (*Id.*) Dial successfully executed the exclusive North and South American license agreement for the ladder (the "Licensing Agreement") on September 25, 1992. (Defs. Trial Ex. A.) The balance of plaintiff's time in September was expended formulating a business strategy with McDonnell and entertaining the patent owners when they visited the United States. (Trial Tr. at 24.)

Defendants argue that compensation was not discussed, and that therefore plaintiff did not reasonably expect to be paid, until the Licensing Agreement was finalized. (Defs. Post–Trial Mem. at 20–21.) We find this argument implausible. Without concrete evidence suggesting otherwise, we are loath to assume that plaintiff knowingly provided his services without an expectation of compensation. Rather, it is more likely plaintiff expected to be paid, but to defer payment until Dial was able to generate revenue—after the Licensing Agreement was finalized. We find that expectation both probable and reasonable.

Plaintiff continued to devote substantial amounts of time to Dial through February 1993. Beginning in January, plaintiff was

---

**2.** Defendants argue that plaintiff is estopped from arguing that he was ever "employed" by Dial because he continued to receive unemployment benefits from the State of New Jersey and to receive free office space at Drake during the relevant period. This argument is without merit. Although plaintiff's actions and representations may properly be considered as some evidence of his credibility, that plaintiff represented to the State of New Jersey that he was unemployed does not preclude this Court from finding, and we do so find, that he was an employee of Dial.

highly involved in drafting a stock offering to potential shareholders to raise approximately $400,000 (the "Subscription Agreement"). (Trial Tr. at 30–32.) Spiegel's billing records confirm that, unlike the Licensing Agreement, plaintiff was not Spiegel's primary contact within Dial with respect to the Subscription Agreement. (*Id.* at 34, 246.) Plaintiff did, however, have significant input with respect to the Subscription Agreement. (*Id.* at 246–49.) During this same time period, Spiegel was developing a Shareholders' Agreement. (*Id.* at 248.) Plaintiff admits that he had the opportunity to review and comment on at least parts of the Shareholders' Agreement as of the end of February. (*Id.* at 34.) During this time, plaintiff continued to develop a business plan, focusing on marketing and sales. (*Id.*)

By March 1, 1993, plaintiff had received no compensation from Dial, and no written employment agreement was in effect. Dial had not made a sale and had no outside investors. (*Id.* at 157–59.) The telescoping ladder failed to meet ANSI standards and was undergoing design modifications.[3] Dial had not yet obtained a United States patent and no agreement had been reached with a manufacturing company.[4] (Pl. Trial Ex. P–4 at 12.)

### III. *April 2, 1993 Meeting*

On Friday, April 2, 1993, plaintiff met with Leonard Silverman, Spiegel and McDonnell at Spiegel's law office in New York City for the purpose of signing the employment contract ("Employment Agreement"), Shareholders' Agreement and Subscription Agreement. (*Id.* at 289.) The Employment Agreement dated March 1, 1993 entitles plaintiff to an annual salary of $120,000 commencing August 1, 1993, a bonus in the discretion of Dial's Board of Directors (the "Board"), and fringe benefits. (Pl. Trial Ex. P–2 at 1.) Additionally, the contract provides plaintiff with three months' salary as severance payment if he was terminated prior to the second anniversary of the contract. (*Id.* at 3.) The Employment Agreement contains a merger clause stating that "[t]his Agreement represents the entire agreement between the parties with respect to Employee's employment with the Corporation. This Agreement may not be modified or terminated unless in writing signed by both parties hereto." (*Id.* at 4.) The Employment Agreement contains no mention of any prior oral or written agreements for payment of $90,000 for the period of June 1992 to March 1993 or for an equity share in Dial.

After carefully reviewing the document, plaintiff signed the Employment Agreement on April 2, 1993. (Trial Tr. at 105–06.) As a former contracts manager, plaintiff fully understood the meaning and

---

**3.** The Subscription Agreement dated April 4, 1993 states:

[a] sample of the Ladder as manufactured by the Licensor has been subjected to testing in accordance with ANSI standards and has failed to pass certain of the tests. Thus, certain design modifications will have to be made.... If the Ladder does not comply with the ANSI requirements, it would be considerably more difficult for the Company to market and distribute the Ladder.... There can be no assurance that design modifications can be effected which will enable the Ladder to meed ANSI standards.

(Pl. Trial Ex. P–4 at 12.)

**4.** The Subscription Agreement states:

[Dial] is currently in negotiations with a third party to manufacture the Ladder. There is no guaranty that the company will be able to conclude negotiations with a manufacturer to manufacture the Ladder on commercially acceptable terms and if the Company cannot, the investors may lose all their investment.

(Pl Trial Ex. P–4 at 11–12.)

effect of the merger clause. (*Id.* at 104–06.) On cross, plaintiff admitted that he was aware of his option to bring suit to enforce any prior oral agreements and chose not to. (*Id.* at 102–07.) In fact, plaintiff's only objection to the contract terms concerned the effective commencement date. (*Id.* at 287.) Originally dated to become effective on March 1, 1993, plaintiff requested and defendants agreed to change the date to March 22, or one day after plaintiff's unemployment benefits were scheduled to expire. (*Id.*) Upon further thought, however, plaintiff requested that the original commencement date be restored and the contract was hand-modified accordingly. (Pl. Trial Ex. P–2 at 1.)

At the same meeting, plaintiff reviewed and signed an acknowledgment of the Shareholders' Agreement. (*Id.* at 114; Defs. Trial Ex. H.) Plaintiff similarly reviewed the Subscription Agreement that would later be distributed to potential investors. (*Id.* at 115–17.) Pursuant to the Subscription Agreement, McDonnell and Fitzgerald entered into a written consent, in lieu of taking action at a special meeting of the Board, to issue plaintiff 7,500 shares of common stock for a purchase price of $10,000 (the "Stock Purchase Agreement"). (Pl. Trial Ex. P–20.) At the April 2, 1993 meeting, plaintiff agreed and accepted the terms of the offer when he signed a letter dated "As of July 15, 1992" that outlined the Stock Purchase Agreement. (*Id.*) Plaintiff has no recollection of the document, suggesting that it either was buried in a pile of documents that he signed without reading or that his signature was forged. (Trial Tr. at 167–68.) We find that neither of these explanations is credible. It is unlikely that plaintiff, a lawyer and an experienced corporate executive, would sign a one-page document without first reading it. Even if he did, he did so at his own peril. Furthermore, other than an unverified and irrelevant allegation that

Spiegel signed Mrs. McDonnell's name, there is no evidence suggesting that plaintiff's signature is anything but authentic. Plaintiff's story is further undermined by the fact that after considering the Stock Purchase Agreement over the weekend, plaintiff gave Dial a check for $10,000 dated April 5, 1993. (*Id.* at 136–37.)

Considering the evidence presented, we conclude that the Stock Purchase Agreement contemplated a credit for sweat equity to plaintiff from Dial in the amount of $110,000 covering the period of September 1992 though July 1993. Outside investors were given the opportunity to invest in Dial at $20 per share. (Pl. Trial Ex. P–4 at 6.) After consulting with plaintiff, McDonnell concluded that a purchase price of $16 per share was adequate to compensate plaintiff for past work rendered. (Trial Tr. at 283.) Plaintiff was therefore credited with $10,000 per month of sweat equity for the eleven months from September 1992 through July 1993; for subsequent periods plaintiff was to receive a salary pursuant to the terms of the Employment Agreement. (*Id.*) The credit began in September, the month Dial obtained the Licensing Agreement, because that was the point at which Dial became a viable business entity. (*Id.* at 281.) After being credited with $110,000 in equity and contributing $10,000 of his own funds, plaintiff received 7,500 shares with a total value of $120,000, or $16 per share.

Plaintiff alleges that he was unaware of the sweat equity arrangement, and contends that we should disregard defendants' argument for want of documentary support. However, defendants' description of the Stock Purchase Agreement is consistent with the Subscription Agreement and a similar deal with Silverman. The Subscription Agreement lists plaintiff's purchase price as $1.33 per share, or 7,500 shares for a total of $10,000. (Defs. Trial

Ex. F at 6.) The $110,000 in sweat equity was not included in the stated purchase price in order to avoid or defer plaintiff's liability for personal income taxes. (Trial Tr. at 226–27, 251.) We note that the exclusion of the sweat equity credit in the Subscription Agreement did not benefit Dial and that Spiegel, who has structured many similar transactions in his law practice, testified that the transaction was in accordance with industry practice. (*Id.* at 251.) That Dial entered into a similar stock purchase agreement with Silverman further undermines plaintiff's argument. Like plaintiff, Silverman had been working for Dial without compensation prior to the Employment Agreement and was given the option to purchase 7,500 shares of Dial at a discounted price of $16. (*Id.* at 284.) Unlike plaintiff, Silverman began working for Dial in February 1993 and his employment agreement provided for a monthly salary of $10,000 beginning on September 1, 1993. (Defs. Trial Ex. I.) Accordingly, Silverman was credited with $70,000 in sweat equity, and was required to contribute the remaining $50,000 from his own funds. (Trial Tr. at 284, 334–36.) In order to give Silverman the same tax benefits afforded plaintiff, the Subscription Agreement lists Silverman's purchase price as $6.67 per share, or 7,500 shares for a total price of $50,000. (Defs. Trial Ex. F at 6.)

Plaintiff argues that at the April 2, 1993 meeting he signed the Employment Agreement under duress. He argues that he was not given enough time to review the pile of documents before him, was not permitted to consult with an attorney and was given an ultimatum to sign the documents or face immediate termination. (Pl. Post–Trial Mem. at 9.) Defendants paint a vastly different picture of the meeting. Spiegel testified that he advised plaintiff, along with all present at the meeting, to consult with an attorney. (Trial Tr. at 256.) Furthermore, both McDonnell and Spiegel testified that the mood at the meeting was jovial. (*Id.* at 231, 289.) During cross-examination, plaintiff admitted that he was not motivated by fear or threat of physical violence to sign the documents, but instead opted to sign because that was more advantageous than any of the alternatives. (*Id.* at 102.) Plaintiff was aware of his option to bring suit rather than sign the documents. (*Id.* at 104.)

## IV. *The Current Action*

For reasons largely irrelevant here, plaintiff was terminated by Dial on February 1, 1995 pursuant to paragraph six of the Employment Agreement. Upon his termination, defendants paid plaintiff $9,333.33 in severance for three months accrued salary subject to the cash flow provision in the Employment Agreement [5]. (Trial Tr. at 173.) Plaintiff now requests that this Court award: (1) an equity interest in Dial not less than 27.5%; (2) $90,000 plus punitive damages and interest for services rendered from June 1992 through February 1993; (3) $50,000 for services rendered from March 1993 through July 1993; (4) $27,500 in accrued vacation; (5) $30,000 of unpaid severance; (6) $72,000 of unpaid bonus; and (7) $160,000 in accrued salary from the date of plaintiff's termination in February 1995. Prior to his termination, plaintiff never made a written demand to Dial for any of the relief now sought.

Plaintiff was terminated prior to the second anniversary of the Employment Agreement. (Trial Tr. at 175.) In refer-

---

5. The Employee Agreement states that an "Employee's salary shall accrue, but not be payable, until the Corporations' Board of Directors determines that the Corporation has adequate cash flow to pay salaries to its executive officers." (Defs. Trial Ex. B ¶ 3(a).)

ence to severance, the Employment Agreement stated in relevant part:

> After the first anniversary of the date hereof, ... the Corporation shall be obligated to pay and Employee shall be entitled to receive the following severance payments:
>
> (a) In the event that such termination occurs prior to the second anniversary to this Agreement, the Corporation shall pay and Employee shall be entitled to receive three (3) months' salary as severance payment; and
>
> (b) In the event that such termination occurs after the second anniversary of this Agreement or if at any time thereafter, the term hereof is not renewed or extended by the Corporation, the Corporation shall pay and Employee shall be entitled to receive six (6) months' salary.
>
> \*   \*   \*   \*   \*   \*
>
> (d) Except for the amounts set forth in this Paragraph 6, the Corporation shall have no further liability or obligation to Employee.

(Pl. Trial Ex. P–2 at 3.)

The Employment Agreement makes no reference to vacation pay, but states only that "[e]mployee shall be entitled to fringe benefits provided to other executive officers of the Corporation." (*Id.* at 2.) Plaintiff testified at trial that he was personally aware that McDonnell received vacation time, although he testified otherwise in his pre-trial deposition. (Trial Tr. at 176–78.) Plaintiff produced no other evidence of any vacation time the other executives received.

## CONCLUSIONS OF LAW

### I. *Detrimental Reliance*

■ Plaintiff brings a claim for detrimental reliance alleging that defendants made representations regarding plaintiff's salary and prospective ownership interest in Dial. Plaintiff argues that he commenced working for Dial in reliance on these representations, expending considerable time and effort.

A claim for detrimental reliance is analyzed as a claim of promissory estoppel where the claim has its basis in an unenforceable oral agreement. *See Bergner & Co. v. Martinez,* 823 F.Supp. 151, 160 (S.D.N.Y.1993). To prevail on a claim for promissory estoppel, a plaintiff must demonstrate by a preponderance of the credible evidence that there was "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reasons of his reliance." *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 72 (2d Cir.1989) (quoting *Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co.,* 804 F.2d 787, 793 (2d Cir.1986)).

### A. *Salary From June 1992 Through February 1993*

■ We hold that plaintiff has not met his burden of demonstrating a claim for detrimental reliance with respect to the alleged promise that he would be paid a salary of $10,000 per month beginning in June 1992. Plaintiff has failed to demonstrate a clear and unambiguous promise made by defendants. Plaintiff testified that McDonnell falsely represented to plaintiff that he would be paid a $10,000 monthly salary beginning in June 1992. However, defendants dispute any such representations, and there is no documentary evidence to support plaintiff's allegations.

Even assuming, *arguendo,* that plaintiff could meet his burden of demonstrating a clear and unambiguous promise that was reasonably relied on, plaintiff cannot prove

damages for the period of September 1992 through July 1993. The evidence demonstrates that plaintiff received a sweat equity credit of $110,000 towards the purchase of stock for past services rendered. Of the nine relevant months, plaintiff was compensated at a rate of $10,000 per month in sweat equity for six of those months. Accordingly, plaintiff cannot demonstrate that he suffered any monetary damages for the period from September 1992 through February 1993.

### B. *Bonus*

■ Plaintiff has similarly failed to demonstrate that defendants made a clear and unambiguous promise regarding a performance bonus. Plaintiff alleges that he was promised a bonus of sixty percent (60%) to one hundred percent (100%) of his salary to be paid in February 1993. Although no specific performance levels were ever established, plaintiff argues that certain specific performance tasks were implicit in the deal, such as obtaining product liability insurance, finalizing the license agreement, obtaining a United States patent and finding a manufacturing company. We do not find that these "implicit" tasks are sufficiently specific to support a promissory estoppel · claim. Furthermore, we find it dubious that McDonnell would promise plaintiff such a substantial bonus by February 1993 when no sales were anticipated until the Spring of 1993. In fact, during the relevant period, only one of the "implicit" tasks, entering into a license agreement, had been completed. Because plaintiff has failed to demonstrate that a sufficiently specific promise was made, we find for defendants on plaintiff's bonus claim.

### C. *Equity*

■ Plaintiff alleges that he reasonably and detrimentally relied on promises made by McDonnell regarding an equity position in Dial. Because plaintiff adduces no evidence other than his testimony to rebut defendants' credible denial of any alleged promises made, we conclude that plaintiff has failed to demonstrate by a preponderance of the credible evidence the existence of a clear and unambiguous promise. Furthermore, even assuming defendants promised plaintiff a progressively declining ownership interest, plaintiff admits that each time his alleged ownership interest was reduced, he understood and acquiesced in the new agreement as a substitute for the old. In spite of these prior dealings, plaintiff argues that when he purchased 7,500 shares of Dial for $10,000, he believed that this agreement was supplemental to the previous oral promises and that, unlike the prior arrangements, this agreement did not supersede any prior agreement. Apart from plaintiff's testimony, however, there is no evidence to support his interpretation of the Stock Purchase Agreement. In light of the prior dealings between plaintiff and defendants as well as the credibility of the defense witnesses, we find in favor of defendants. Accordingly, we dismiss plaintiff's detrimental reliance claims.

### II. *Common Law Fraud*

Plaintiff asserts a claim for common law fraud against McDonnell, acting on his own behalf and on behalf of Dial. To prevail on a claim for fraud under New York common law, a plaintiff must demonstrate by clear and convincing evidence that the defendant: "(1) made an omission, misrepresentation, or false statement of material fact; (2) with knowledge of its falsity; (3) with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused damage to the plaintiff due to the plaintiff's reliance thereon." *Lomaglio Assocs. Inc. v. LBK Mktg. Corp.*, 892 F.Supp. 89, 94 (S.D.N.Y.1995) (quoting *Di-*

*duck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 276 (2d Cir.1992)); *see also Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 971 (2d Cir.1987).

Based on the same oral representations underlying the detrimental reliance claims, *see supra* Part I., plaintiff argues that McDonnell intentionally and knowingly made materially false representations to plaintiff with the intent to defraud him with respect to his salary and prospective ownership interest in Dial. We disagree. Plaintiff has failed to demonstrate by clear and convincing evidence, or even by a preponderance of the credible evidence, that McDonnell made an intentional misrepresentation or omission to plaintiff. Plaintiff testified that McDonnell falsely represented that plaintiff would receive a fifty percent (50%), later revised to twenty-seven and one-half percent (27.5%), interest in Dial and that he would be paid a monthly salary of $10,000 beginning in June 1992 and payable in February 1993 plus bonus. For reasons already outlined, *see supra* Part I., we hold that plaintiff has failed to meet his burden and dismiss all claims for common law fraud.

### III. *Quantum Meruit and Unjust Enrichment*

In the absence of a formal contract, "the court may nonetheless allow recovery in *quantum meruit* 'to assure a just and equitable result' where 'the defendant received a benefit from the plaintiff's services under circumstances which, injustice, preclude him from denying an obligation to pay for them.'" *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996) (quoting *Bradkin v. Leverton*, 26 N.Y.2d 192, 309 N.Y.S.2d 192, 195–97, 257 N.E.2d 643 (1970)).

■ Plaintiff brings a claim for *quantum meruit* and unjust enrichment, arguing that he "performed services in good faith for Dial at defendants' request with the expectation that he would be compensated at a rate of ten thousand ($10,000) dollars per month . . . ." (Am.Complt.¶¶ 52–53.) Though presented here as separate claims, "*quantum meruit* and unjust enrichment are not separate causes of action. Rather, unjust enrichment is a required element for an implied-in-law, or quasi contract, and *quantum meruit*, meaning 'as much as he deserves,' is one measure of liability." *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 768 F.Supp. 89, 96 (S.D.N.Y.1991), *rev'd on other grounds*, 959 F.2d 425 (2d Cir.1992). To prevail on a claim of unjust enrichment, a plaintiff must prove that the "defendant received a benefit at plaintiff's expense and that retention of that benefit would be unjust." *Industrial Acoustics Co. v. Energy Serv., Inc.*, Nos. 93 Civ. 2865, 94 Civ. 0377, 1995 WL 274432, at *7 (S.D.N.Y. May 9, 1995). To recover under *quantum meruit*, plaintiff must establish by a preponderance of the credible evidence: "(1) performance of services in good faith; (2) the acceptance of the services by the person to whom they are rendered; (3) an expectation of compensation therefor; and (4) the reasonable value of the services." *Moors v. Hall*, 143 A.D.2d 336, 532 N.Y.S.2d 412 (1988). Unless the nature of the relationship between the parties indicates otherwise, "the performance and acceptance of services gives rise to the inference of an implied contract to pay for the reasonable value of such services." *Id.* at 414.

■ We conclude that plaintiff sufficiently demonstrated his right to *quantum meruit* recovery for services rendered to Dial during the period of June 1992 through August 1993. Although "a contract cannot be implied in fact when there is an express contract covering the subject matter involved," *GSGSB, Inc. v. New York Yankees*, 862 F.Supp. 1160, 1170 n. 8

(S.D.N.Y.1994) (internal citations omitted), from the time plaintiff commenced work in June 1992 until he signed the Employment Agreement in April 1993 backdated to March 1, 1993, there was no express contract covering plaintiff's compensation. Plaintiff began working for Dial in June 1992 with the expectation that he would be paid. He provided numerous services to Dial during this period, including, *inter alia*, negotiating a license agreement and working on a business plan. *See supra* FINDINGS OF FACT, Part II. There is no genuine dispute that Dial accepted and benefitted from these services.

We find that the reasonable value for plaintiff's services is properly measured at ten thousand dollars ($10,000) per month. Plaintiff does not contest this amount and it is consistent with the subsequent Employment Agreement that valued plaintiff's services at $120,000 annually. However, because plaintiff was compensated in sweat equity for six of the relevant nine months, *see supra* Part I.A., we now limit his recovery for services rendered to the months of June, July and August 1992. Furthermore, plaintiff testified that he devoted approximately half of his time to Dial during June. Accordingly, we conclude that plaintiff is entitled to recover $25,000 in damages under *quantum meruit*, $5,000 for June and a total of $20,000 for July and August.

### IV. *Contract Claims*

Plaintiff asserts five separate claims for damages under the Employment Agreement for: (1) $50,000 for services rendered from March 1993 through July 1993; (2) $27,500 in accrued vacation; (3) $30,000 of unpaid severance; (4) $72,000 of unpaid bonus; and (5) $160,000 in accrued salary as of the date of plaintiff's termination. As an initial matter, this Court has determined that plaintiff was compensated in sweat equity for the March 1993 to July 1993 period. *See supra* FINDINGS OF FACT, Part III. Furthermore, under the unambiguous terms of the Employment Agreement, while it appears plaintiff has a claim for the unpaid portion of his severance of three months salary, he is not entitled to six months of severance because he was admittedly terminated prior to the second anniversary of the Employment Agreement. (Trial Tr. at 174–75.) Nonetheless, we reach no final conclusions as to plaintiff's contract claims because they are beyond the scope of the instant dispute. As made clear in our prior Opinion and Order, the instant action is limited to plaintiff's claims for detrimental reliance, fraud, *quantum meruit* and unjust enrichment for the June 1992 through March 1, 1993 period. *See* Opinion and Order dated February 23, 2000 at 19. Plaintiff's Amended Complaint was never subsequently amended to allege additional breach of contract claims. Accordingly, we shall not consider plaintiff's request for contract damages. Should plaintiff wish to recover damages under the Employment Agreement, he must file suit properly alleging his breach of contract claims.

### CONCLUSION

For the reasons stated above, we find in favor of plaintiff with respect to plaintiff's *quantum meruit* and unjust enrichment claim. Accordingly, the Clerk of the Court is directed to enter judgment on behalf of plaintiff in the amount of $25,000. All other claims are dismissed with prejudice.

**SO ORDERED**